Peter GILBERT and William
Steiner, Plaintiffs,

v.

The EL PASO COMPANY and
Burlington Northern, Inc., et
al., Defendants.

Herbert BREITMAN, as sole Trustee of
Ed Rosenthal Neckwear, Inc. Profit
Sharing Plan, and all other parties similarly situated and circumstanced,
Plaintiff,

v.

BURLINGTON NORTHERN, INC., et
al., Defendants.

Court of Chancery of Delaware,
New Castle County.

Submitted: Oct. 17, 1984.

Decided: Nov. 27, 1984.

---

William Prickett, of Prickett, Jones, Elliott, Kristol and Schnee, Wilmington, Del.; Abraham G. Levin, Esquire and Martin A. Coleman, of Rubin Baum Levin Constant & Friedman, New York City; Mordecai Rosenfeld, New York City, for plaintiffs.

A. Gilchrist Sparks, III, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del.; Marc P. Cherno, Stephen D. Alexander, Esquire and Marla G. Simpson, of Fried, Frank, Harris, Shriver & Jacobson, New York City, for Burlington defendants.

Robert K. Payson, of Potter, Anderson & Corroon, Wilmington, Del., for The El Paso Co.

WALSH, Vice Chancellor.

This is a class action arising out of Burlington Northern Inc.'s ("Burlington") takeover of the El Paso Company ("El Paso") in early 1983. The plaintiffs are those shareholders who tendered into Burlington's December 21, 1982, tender offer, which Burlington later terminated, and subsequently were subject to proration in the second tender offer made in January, 1983. Plaintiffs' complaint contains a number of allegations against El Paso and Burlington[1] concerning the termination of the first tender offer and the terms of the second tender offer. It is alleged that both corporate defendants and their respective directors manipulated the corporate machinery for entrenchment purposes, conspired to breach fiduciary duties and interfered with business relationships. Burlington is separately charged with breach of contract and equitable estoppel.

Burlington has moved to dismiss the complaint, or alternatively, for summary judgment on all counts asserting that (1) it

---

1. There are two Burlington defendants: Burlington Northern, Inc. and its subsidiary, R–H Holdings Corporation, apparently organized for the purpose of effecting the El Paso takeover. For present purposes, there is no basis to distinguish between them and they will be referred to collectively as "Burlington."

owed no fiduciary duty to the El Paso shareholders, (2) it had an unqualified right to terminate the December tender offer upon the occurrence of events specified in that tender offer, and (3) it could not be held liable for conspiracy merely because it conducted arm's-length negotiations with El Paso management to obtain the lowest available price for El Paso stock.

In the context of a motion to dismiss, or for summary judgment, Burlington must demonstrate that the plaintiffs could not prevail under any state of facts which could be proved in support of their claim. *Penn Mart Realty Company v. Becker,* Del.Ch., 298 A.2d 349 (1972), or that no material question of fact exists and that Burlington is entitled to relief as a matter of law. In addition, all factual inferences must be resolved in favor of the plaintiffs as the nonmovants. *Judah v. Delaware Trust Co.,* Del.Supr., 378 A.2d 624, 632 (1977). So viewed, the following factual pattern emerges. On December 21, 1982, Burlington made a tender offer for 25,100,-000, or 51% of the shares of El Paso at $24 a share, a 25% premium above market value. The stated terms of the offer provided for withdrawal of the tendered shares through January 12, 1983, and included a number of conditions, the occurrence of which, at Burlington's option, might terminate its obligation to purchase the tendered shares. These conditions, or "outs," included (1) litigation challenging the tender offer, (2) a change, or proposed change, in the business, assets, or properties of El Paso, (3) the issuance of, or a proposal to issue, additional shares of El Paso stock, (4) the adoption of, or a proposal to adopt, any amendment to El Paso's charter or bylaws, and (5) a definitive agreement for a merger or other business combination between El Paso and Burlington.

The conditions engrafted on Burlington's offer anticipated the type of defensive activities a target company often takes in opposing a hostile takeover. Thus, it is not surprising that each of these conditions actually occurred in the three weeks follow-ing Burlington's initial tender offer. The El Paso board of directors responded aggressively to Burlington's announcement. It advised its shareholders that the $24 dollar offering price was inadequate and initiated actions to discourage Burlington's overture, including litigation challenging the offer; the announcement of plans to issue a preferred stock dividend; proposed bylaw amendments and negotiations to sell certain of its assets. In addition, the Attorney General of Texas, apparently at the urging of El Paso, sought to enjoin the offer on antitrust grounds. These measures failed to stem the interest of El Paso's shareholders who by January 10, 1983, had tendered 25,433,166 shares in complete satisfaction of the tender offer. On January 12, the tendering shareholders no longer would have been able to withdraw their shares, and Burlington would have been able to purchase those shares and gain control of El Paso.

In the meanwhile, however, the hostile takeover turned friendly as the El Paso Board reached an agreement with Burlington. On January 10, 1983, the former antagonists announced the terms of an agreement under which (1) Burlington agreed to revoke the December tender offer, (2) Burlington would commence a new tender offer for 21 million shares of El Paso common, with El Paso itself selling Burlington the additional 4,166,667 shares needed to achieve control, and (3) certain El Paso directors were granted "golden parachutes," *i.e.,* employment benefits, in the event of a takeover. Because the revised offer permitted El Paso and certain of its directors to sell their shares directly to Burlington, it had the effect of denying certain shareholders the opportunity to participate in the second tender offer, which was oversubscribed with more than 40 million shares tendered. Thus, although the offering price of $24 per share remained unchanged, plaintiffs and the class members were unable to realize the premium for all the shares already deposited under the first tender offer.

Even though Burlington eventually acquired all outstanding shares of El Paso in a second stage offer at a later date and at the same $24 price, the January tender offer contained no requirement concerning the time of purchase or price of shares to be acquired in the second tier. Prior to that time, the plaintiff class claims to have sold their shares on the open market at a substantial discount under the tender offer price.

Burlington's motion for summary judgment, while conceding plaintiffs' view of the record, questions the legal validity of the alternative grounds for recovery. In essence, it contends that as a tender offeror, pursuing its own economic interests, it owed the plaintiff class no contractual or fiduciary duty. To the extent that its role as an offerer is subject to federal law requirements of disclosure and non-manipulation Burlington rests upon a determination in companion federal litigation which absolved it of federal securities law violations *vis-a-vis* the plaintiff class.[2] It is therefore necessary to test separately the merit of plaintiffs' claims arising under State law.

## I

Plaintiffs' primary grievance is that Burlington breached its contractual obligation to complete its December tender offer. The parties agree that New Jersey law controls this question because the depository arrangement under which shares were to be tendered took place in that State. There are, however, no unique provisions of New Jersey statutory or decisional law which suggest a result at variance with general considerations of contract law.

■ A tender offer results in formation of a contract where it invites acceptance through the performance of a specific act, rather than through an exchange of promises. 1 Williston, Contracts §§ 31, 76 (3d ed. 1957); 1 Corbin Contracts § 62; Restatement of Contracts (Second) § 30. The specific response sought through a tender offer to purchase securities at a stipulated price is the deposit of shares into the depository during a designated period of time. But the offeror is "master of his offer" and may attach conditions which limit his obligation in full or in part. *Kroeze v. Chloride Group LTD*, 5th Cir., 572 F.2d 1099, 1105 (1978); *Lowenschuss v. Kane*, 2d Cir., 520 F.2d 255 (1975). Where the specified condition is a condition subsequent, it serves to relieve the offeror of the obligation to proceed upon the happening of a future event, even in the face of an act of acceptance, if the condition subsequent occurs within the time reserved.

Plaintiffs acknowledge that many, if not all of the "conditions out" specified in Burlington's December tender offer occurred. Litigation both in Delaware and in Texas was in progress when the December offer was terminated and El Paso's efforts to amend its bylaws and sell certain of its assets are not disputed. Plaintiffs rely, however, on Burlington's alleged failure to exercise its option to terminate the tender offer in good faith. Implicit in every contractual relationship, it is argued, is the obligation of a party who seeks to invoke a condition relieving that party of proceeding with an undertaking to do so with honesty and fair dealing, particularly where the opposing party has acted in reliance upon the outstanding posture of the offer. In effect, plaintiffs seek to impose a test of subjective good faith rather than the objective search for the occurrence of specified conditions.

■ An implied covenant of good faith and fair dealings is engrafted upon every contract. 5 Williston, Contracts § 670 (3rd Ed. 1969); *Onderdonk v. Presbyterian*

---

**2.** In *Schreiber v. Burlington Northern, Inc.*, D.Del., 568 F.Supp. 197 (1983); *aff'd*. 3d Cir., 731 F.2d 163 (1984), Chief Judge Latchum determined that the conduct of Burlington and El Paso in structuring the terms of the January tender offer did not constitute manipulation or

actionable nondisclosure within the meaning of § 14(e) of the Williams Act (15 U.S.C. § 78n(e)). In the absence of underlying federal jurisdiction, the Court declined to rule upon the pendant state claims which mirror the claims in this case.

*Homes of N.J.,* N.J.Supr., 85 N.J. 171, 425 A.2d 1057, 1062–63 (1981). This requirement extends to the enforcement of conditions and may preclude a party from avoidance of a contractual undertaking through invoking a condition which occurred by reason of his own actions. *Association Group Life, Inc. v. Catholic War Veterans,* N.J.Supr., 61 N.J. 150, 293 A.2d 382, 384 (1972). Similarly, if one party is given discretion in determining whether the condition in fact has occurred that party must use good faith in making that determination.

While the result of Burlington's termination of its December tender offer might appear unfair to those shareholders who tendered their shares in response to the announcement, it cannot be said that they were misled concerning Burlington's right to do so. The offer expressly provided that Burlington "shall not be required to accept for payment or pay for tendered Shares, or may terminate or amend the Offer" if any of the specified conditions occur, and Burlington, in its "sole judgment," decides that proceeding with the tender offer is "inadvisable." This language placed tendering shareholders on clear notice that upon the occurrence of any condition, Burlington reserved for itself the choice of proceeding with the tender offer or invoking the condition and terminating the offer.

 The application of a good faith or subjective standard to the enforcement of conditions is appropriate where either the definition or the declaration of occurrence of the condition is left to the sole discretion of the invoking party. *Onderdonk, supra.* Where, as here, the conditions are expressed, the motivation of the invoking party is, in the absence of fraud, of little relevance. Certainly, a party to a contractual undertaking is free to pursue its economic interests through the application of conditions intended to limit the cost of proceeding. Thus, even if Burlington's real motivation was, as plaintiffs urge, to secure a definitive agreement of merger, on terms more beneficial to it, as an alternative to its December tender offer, the tender offer expressly so contemplated. Although the terms of that later agreement may be subject to question, as noted hereafter, Burlington's right to pursue that course does not infringe upon plaintiffs' contractual rights under the tender offer.

## II

Next to be considered is plaintiffs' claim of breach of fiduciary duty. Although Burlington owned only 1% of El Paso's shares when it commenced its takeover efforts, plaintiffs maintain that once Burlington achieved the initial goal of its December tender offer, that is, once it became aware that there were sufficient shares in the depository to constitute control, it wore the mantle of fiduciary responsibility. Plaintiffs argue that Burlington used "the power to control El Paso" in fashioning a friendly agreement with El Paso's management, a consequence of which was the squeezing out of the plaintiff class from the second tender offer. In any event, it is argued, there are material issues of fact which preclude a determination of fiduciary obligation.

 Generally, a shareholder who owns less than 50% of a corporation's outstanding stock does not, without more, become a controlling shareholder of that corporation, with a concomitant fiduciary status. *Osofsky v. J. Ray McDermott & Co., Inc.,* 2d Cir., 725 F.2d 1057 (1984). For controlling stock ownership to exist in the absence of a numerical majority there must be domination by a minority shareholder through actual exercise of direction over corporate conduct. *Kaplan v. Centex Corporation,* Del.Ch., 284 A.2d 119 (1971).

As the party resisting summary judgment plaintiffs are entitled to the inference that Burlington, by virtue of its depository achievement, assumed a superior bargaining position in dealing with El Paso's management. To that extent it may be said that Burlington used its *right* to future control as leverage to fashion a merger agreement more to its benefit. But its

status, however enhanced, remained that of an outsider, free to bargain but not to dictate terms to El Paso's management. Burlington's lack of actual control is illustrated by its frustration in attempting to block El Paso's attempt to sell certain of its assets, the so-called "crown jewels." Not only was Burlington unsuccessful in blocking El Paso's efforts to solicit offers for these assets, but also El Paso refused to permit Burlington to participate in the bidding for them.

Plaintiffs' contention that Burlington occupied a fiduciary role because of its potential for control is subject to the same infirmity as its contract argument. Because of the conditional nature of the tender offer, no fixed legal relationship arose as long as Burlington was entitled to withdraw its tender offer. While, as previously noted, certain claims, actionable under federal securities law, may arise from the manner and method of a tender offer, Burlington has been absolved of misconduct in that respect. State law claims of breach of contract and breach of fiduciary relationship must subsist on the actuality of a specific legal relationship, not in its potential.

■ In sum, I conclude that Burlington, as a hostile tender offeror, not exercising actual control over the corporate affairs of its target, El Paso, owed no direct duty of a fiduciary nature to El Paso's shareholders.

### III

I turn now to the crucial and dispositive issue—the conspiracy claim. Plaintiffs contend that, even in the absence of a direct fiduciary obligation, Burlington used its potential for control to extract from Burlington conditions more favorable to it than the December tender offer and in the process caused El Paso's directors to breach their fiduciary duty to El Paso's shareholders, including plaintiffs. The focus thus shifts to El Paso's conduct during the period between the depository achievement and the announcement of the merger agreement. It is plaintiffs' position that if

El Paso's directors, in the face of inevitable defeat, abandoned their resistance in order to fashion a better deal for themselves at the expense of certain of its shareholders who had already tendered into the December offer, such conduct would constitute a breach of fiduciary duty. And, the argument runs, if Burlington was a party to the agreement it may share liability under the theory of civil conspiracy.

Although the record is silent on the events which preceded Burlington's January 10, announcement that it had reached an amicable agreement with El Paso's management, at least two scenarios, both favorable to plaintiffs, may be inferred. Under the first it may be assumed that Burlington, when it became aware that sufficient shares had been tendered into the depository to constitute control, approached El Paso's management, suggested the inevitable result and proceeded to dictate terms of a friendly takeover. These terms which included the termination of all litigation, the cessation of efforts to sell assets and the retention of the charter and the bylaw structure were achieved without increasing the December tender offer price. Burlington presumably was aware that certain terms requested by El Paso's management, the sale of treasury shares and the opportunity for directors to tender into the revised offer, would result in certain of El Paso's own shareholders being squeezed out of the second offer. The other chain of events portrays El Paso's management initiating takeover discussions after it became aware that Burlington had achieved the potential for control through its depository. Because of Burlington's superior bargaining position the result is the same and the detriment to plaintiffs equally evident.

Plaintiffs contend that regardless of which of the defendants initiated the discussions which led to the friendly tender offer, Burlington's participation, with presumed knowledge of El Paso's fiduciary duty to protect the interests of its shareholders, and its agreement to terms which,

*inter alia,* narrowed the pool of shares which could be tendered into the second offer, constituted civil conspiracy. Burlington replies that because its primary obligation is to its own shareholders, its effort to obtain the best price through negotiations with El Paso was in furtherance of its own corporate responsibility.

 It is well settled that a third party who knowingly participates in the breach of a fiduciary's duty becomes liable to the beneficiaries of the trust relationship. *Jackson v. Smith,* 254 U.S. 586, 589, 41 S.Ct. 200, 201, 65 L.Ed. 418 (1921); *Laventhol, Krekstein, Horwath & Horwath v. Tuckman,* Del.Supr., 372 A.2d 168, 170 (1976); *Penn Mart Realty Company v. Becker,* Del.Ch., 298 A.2d 349, 351 (1972); *Scott on Trusts,* § 326.5 (3rd Ed. 1967). In *Penn Mart,* this Court set forth the three elements which must be asserted in support of a claim of civil conspiracy: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) knowing participation in that breach by the party not in direct fiduciary relationship. A fourth element, the allegation of damages resulting from the action of the conspiracy parties, also is required. *Weinberger v. UOP, Inc.,* Del.Ch., 426 A.2d 1333, 1348 (1981), *rev'd on other grounds,* Del.Supr., 457 A.2d 701 (1983). *Weinberger* notes that while the essence of a criminal conspiracy is the agreement, the essence of a civil conspiracy is damages.

While El Paso is not a party to the present motion and has not participated in the briefing, it may be assumed, at this juncture at least, that it owed a fiduciary duty to the plaintiff class not to prejudice their interests in the December tender offer. This does not mean that El Paso's management was not free to attempt to persuade its shareholders not to tender their shares or to engage in other defensive tactics, but El Paso could not interfere with the alienability of the tendered shares by pursuing its own interests. Since Burlington had already achieved a control level of shares in the December depository, the in-

clusion in the friendly agreement of a revised tender for fewer shares at the same price because of the direct purchase of shares from El Paso's treasury and from certain of El Paso directors who had not tendered into the December offer hardly advanced the interests of El Paso's shareholders, particularly those who had already tendered their shares into the December offer. But the agreement which led to the January tender offer accommodated Burlington by permitting it to purchase 4,166,667 newly issued shares of El Paso stock directly from El Paso. The $100 million resulting payment by Burlington to El Paso would, of course, redound to its benefit once control was secured. Because the purchase of the treasury shares was clearly to its own benefit, it is arguable whether Burlington may be said to have conspired with El Paso to acquire them. But because this valuable concession, which greatly impacted upon El Paso's shareholders who had already tendered their shares, was extracted in exchange for other terms which clearly benefitted only El Paso's management and not its shareholders, it cannot be said, as a matter of law, that Burlington was merely engaged in arm's-length negotiations. Clearly, the purchase of approximately 556,000 shares from El Paso's directors, who had disdained tendering into the December offer, falls within the ambit of a claim of civil conspiracy. By agreeing to purchase them from El Paso's directors, Burlington is chargeable with knowledge that El Paso's directors were preferring their interests to certain of its shareholders who had already tendered. In effect, Burlington in permitting displacement of shares already tendered with shares to be tendered by El Paso's directors became a party to subjecting certain of El Paso's shareholders to extensive proration. To the extent those shareholders suffered damages, an issue not contested by Burlington in the context of its motion for summary judgment, the elements of a civil conspiracy appear complete.

**1058** ■

■ Burlington attempts to refute the conspiracy claim by reliance upon *Weinberger v. United Financial Corp. of California*, Del.Ch., C.A. 5915, V.C. Hartnett (October 13, 1983), in which this Court refused to impose liability upon an offeror in a tender offer who simply pursued arm's-length negotiations with a target company in an effort to obtain the best price it could. *Weinberger*, however, does not stand for the proposition that pursuit of the best available price in negotiations with opposing management can be undertaken without regard to the target management's fiduciary obligations to its shareholders. In *Weinberger* the Court noted that "no fact has been adduced to indicate that National aided and abetted the United Financial board in any way." Slip at 29. Obviously, an offeror who does participate in a target board's breach of fiduciary duty, cannot be said to be conducting arm's-length negotiations. Furthermore, as indicated in *Penn Mart, supra*, the offeror's fiduciary duty to its own shareholders to obtain the best price for stock purchased, does not necessarily obviate the offeror's duty to refrain from participating in the target management's breach of fiduciary duty. Thus, although an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders.

■ It is clear that Burlington's motion for summary judgment must be denied as to the conspiracy claim. Viewing all inferences in a light most favorable to the plaintiffs, a number of triable issues of fact exist concerning the negotiations which led to the agreement announced on January 10, 1983, and its detrimental effect on the plaintiff class. In short, if El Paso's board breached its fiduciary duty to its shareholders, with Burlington's knowing participation, and damages are shown, then the plaintiffs can prevail.

It should be emphasized, however, that the denial of summary judgment as to the conspiracy claim is based upon Burlington's conduct in fashioning the terms of the January tender offer. Its liability, if any, to plaintiffs does not arise contractually, or through a direct fiduciary relationship, in the context of the formulation or termination of the December tender offer. This distinction, while subtle, is a necessary one if Burlington's role as an alleged co-conspirator is to remain actionable.

### IV

■ Lastly, the plaintiffs also allege tortious interference with a contractual business relations against both El Paso and Burlington. This claim is quickly addressed. Because Burlington was a party to the contract representing the first tender offer, the plaintiffs plainly have no cause of action against Burlington for tortious interference with that contract. *Wilmington Trust Co. v. Clark*, Md.Ct.App., 289 Md. 313, 424 A.2d 744, 754 (1981); *Battista v. Lebanon Trotting Ass'n*, 6th Cir., 538 F.2d 111 (1976). Accordingly, the defendant's motion to dismiss with respect to this count is granted.

### V

In summary, Burlington's motion for summary judgment as to Counts I, II, III and VI is granted. The claim of equitable estoppel (Count IV) has not been briefed by plaintiffs and is apparently abandoned. As to the conspiracy claim, Count V, the motion for summary judgment is denied.