**William B. WEINBERGER, Plaintiff,**

v.

**RIO GRANDE INDUSTRIES, INC., Harry Blundell, W.K. Coors, W.J. Holtman, Gerald H. Phipps, G.B. Aydelott, John Evans, Jr., Roy W. Simmons, William Thayer Tutt, David P. Gardner, Charles H. Leavell, D.E. Provost, Mayfield R. Shilling, the Anschutz Corp. and TAC Acquisition Corp., Defendants.**

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 8, 1986.
Decided: Oct. 22, 1986.

Norman M. Monhait of Morris & Rosenthal, P.A., Wilmington and Patricia I. Avery and Benedict Wolf of Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiff.

Edward P. Welch of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Rio Grande defendants.

Charles F. Richards, Jr., Jesse A. Finkelstein and Nathan B. Ploener of Richards, Layton & Finger, Wilmington and William Rosoff of Davis, Polk & Wardwell, New York City, for defendant TAC Acquisition Corp.

## OPINION

JACOBS, Vice Chancellor.

This is a class action arising out of a merger whereby Anschutz Corporation ("Anschutz"), in a two-step transaction

commencing with a cash tender offer, acquired Rio Grande Industries, Inc. ("Rio Grande") in October, 1984. The class consists of the common stockholders of record of Rio Grande as of October 1, 1984, the date on which the proposed transaction was announced. The defendants are Rio Grande and its directors who approved the merger (the "Rio Grande defendants"), as well as Anschutz and TAC Acquisition Corporation ("TAC"), a wholly-owned Anschutz subsidiary organized to effectuate the merger.[1]

In his amended complaint the plaintiff alleges that Rio Grande and its directors, aided and abetted by Anschutz and TAC, breached their fiduciary duty to the Rio Grande shareholders by failing to disclose material facts and information in the Schedule 14D–9 which the Rio Grande defendants filed with the Securities and Exchange Commission ("S.E.C.") and disseminated to Rio Grande's shareholders in connection with the tender offer/merger transaction.

Presently pending before the Court are the Rio Grande defendants' motion to dismiss the amended complaint or, alternatively, for summary judgment, and defendant TAC's motion to dismiss. This is the decision of the Court on both motions.

## I.

On a motion to dismiss, the moving parties must demonstrate that the plaintiff cannot prevail under any set of facts that could be proved to support his claim. *Delaware State Troopers Lodge No. 6 v. O'Rourke*, Del.Ch., 403 A.2d 1109, 1110 (1979). On a motion for summary judgment, the moving parties must establish that no material question of fact exists and that they are entitled to relief as a matter of law. *Gilbert v. El Paso Co.*, Del.Ch., 490 A.2d 1050, 1053 (1984). In making that determination, all factual inferences must be resolved in favor of the nonmoving party. *Judah v. Delaware Trust Co.*, Del. Supr., 378 A.2d 624, 632 (1977). With those principles in mind, what follows is a recital of the undisputed material facts of record.

Rio Grande is a railroad holding company formed in 1968 by the Denver & Rio Grande Western Railroad Co. ("DRGW") to acquire the common stock of DRGW and to engage in a program of diversification into non-railroad business activities. Through DRGW, Rio Grande was and is primarily engaged in providing railroad freight transportation in the Western portion of the United States.

In early 1984, Rio Grande entered into preliminary discussions with several parties that were interested in acquiring it. On April 25, 1984, representatives of Anschutz and Rio Grande met to discuss the possibility of an acquisition. At that meeting Rio Grande offered Anschutz access to certain non-public information regarding Rio Grande. Afterwards, the parties executed a confidentiality agreement under which they exchanged information and conducted negotiations.

In late July, 1984, Anschutz forwarded a draft merger agreement to Rio Grande for its consideration, but after some negotiations the parties were unable to arrive at an agreement. Periodic discussions between Anschutz and Rio Grande nevertheless continued, parallel to discussions that Rio Grande was conducting simultaneously with other potential acquirers. Eventually Rio Grande and Anschutz were able to reach agreement. On September 29, 1984, Anschutz submitted to Rio Grande a revised draft merger agreement which Rio Grande's Board of Directors unanimously approved on October 1, 1984. In taking that action, the Rio Grande directors relied on the opinion of Morgan Stanley & Co. ("Morgan Stanley"), the company's specially-retained investment bankers, that the

1. Although named as a defendant, Anschutz, a Kansas corporation with executive offices in Denver, Colorado, was not personally served with a summons and complaint. TAC, which is a Delaware corporation, was properly served. Accordingly, the plaintiff's allegations against Anschutz will be considered only insofar as they pertain to its subsidiary, TAC.

terms of the transaction were fair to Rio Grande's stockholders.

In substance, the merger agreement provided that Anschutz's wholly-owned subsidiary, TAC, would commence a cash tender offer to purchase all of Rio Grande's outstanding common shares for $50 per share. A condition of the tender offer was that at least 51% of the outstanding shares would be properly tendered and not withdrawn before the offer expired. Upon the successful completion of the tender offer, a "second-step" merger of TAC into Rio Grande would take place at the tender offer price of $50 per share, cash.

On October 1, 1984, Rio Grande and Anschutz issued a joint press release that described the essential terms of the merger and stated that Rio Grande's Board of Directors had recommended that its shareholders accept the Anschutz offer. Pursuant to S.E.C. Rule 14D–9, Rio Grande also filed with the S.E.C., and disseminated to its shareholders, a Schedule 14D–9 in which the directors recommended that the shareholders accept the offer and stated their reasons for that recommendation. Ultimately, 92% of Rio Grande's common shares were tendered in response to the Anschutz (TAC) tender offer, and shortly thereafter, the second-step short-form merger between TAC and Rio Grande took place.

At about the same time Rio Grande began to engage in preliminary discussions about a possible acquisition, the Santa Fe Southern Pacific Corporation announced its intention to apply to the United States Interstate Commerce Commission ("ICC") for authorization to merge the Santa Fe and the Southern Pacific railroads. Although the proposed Santa Fe-Southern Pacific Merger was legally unrelated to the Rio Grande/TAC merger, it was, nonetheless, quite significant to Rio Grande. Rio Grande's management believed that ICC approval of a Santa Fe-Southern Pacific merger would adversely affect Rio Grande's ability to compete as a rail carrier in the Central Corridor, unless, as a condition of that merger, the ICC conferred certain trackage rights upon Rio Grande. If Rio Grande were thus permitted to acquire such trackage rights, Rio Grande's management believed that the Company's competitive position would be significantly improved.

Rio Grande's shareholders were first told of the existence of the impending ICC proceedings (and their possible adverse effect upon Rio Grande) in a March, 1984 letter from the Chairman of Rio Grande enclosing Rio Grande's 1983 Annual Report to shareholders. In that letter the Chairman advised, with respect to the proposed Santa Fe/Southern Pacific merger, that

> "[S]tockholders should rest assured that this management will not permit situations to occur which could endanger the Company's future without the most aggressive actions it can muster. In that regard, the Company is fully prepared to present its case to the ICC that will protect the interests of the Rio Grande stockholders ..." [2]

Rio Grande took a similar stance in a press release issued on May 17, 1984, stating that "Rio Grande's filing with the ICC would be made on or before the June 4, 1986 response dead line in the case", and then adding:

> "If Rio Grande is successful in the case, it will become a long-line carrier with the benefits of that new status in the transcontinental market, and will have transportation service capabilities from Kansas City, Missouri to the Bay Area in California and into Oregon." [3]

On July 19, 1984, Rio Grande, acting through its subsidiary DRGW, filed a preliminary "Responsive Application" with the

2. A similar statement appeared on page 8 of the approximately 35 page Annual Report under the heading "Rail Mergers."

3. The press release was reprinted verbatim in Rio Grande's Quarterly Report that was dated May 30, 1984 and sent to stockholders soon thereafter.

ICC. In that Application Rio Grande sought authority to acquire certain lines of the Southern Pacific Transportation Company and to obtain unrestricted trackage rights over certain other lines, all as conditions of the proposed Santa Fe-Southern Pacific merger. On September 10, 1984, Rio Grande filed a Supplemental Responsive Application which contained statistical and other data, all designed to demonstrate what impact the Santa Fe-Southern Pacific merger would have upon Rio Grande, if Rio Grande did (or did not) obtain the requested trackage rights.

Rio Grande's September 10, 1984 Responsive Application also contained certain *pro forma* financial statements. Those statements, using 1983 as the base year, forecasted Rio Grande's economic performance over a 3–year period on the assumption that the ICC granted to Rio Grande all of the purchase and trackage rights that it was seeking. The *pro formas* projected a material improvement in Rio Grande's financial position. For example, the projection for "year 1" income called for an 82% increase in income over Rio Grande's net income for calendar year 1983. Morgan Stanley considered those *pro forma* financial statements in determining whether the TAC offer was fair to Rio Grande's stockholders, but gave them virtually no weight, because of their unreliability as an accurate prediction of Rio Grande's future performance.

It is undisputed that neither Rio Grande's Schedule 14D–9 nor TAC's "Offer to Purchase" disclosed or made reference to the status of the ICC proceedings or to the *pro formas* which Rio Grande had filed in those proceedings several weeks before the TAC offer was commenced.

## II.

Where, as here, the plaintiff advances a claim of material nondisclosure, the standards articulated in *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278 (1977) and its progeny are the appropriate analytic starting point. In *Lynch,* the Su-preme Court of Delaware established the now well-settled rule of Delaware law that corporate directors owe the corporation's stockholders a fiduciary duty to disclose all facts germane to a transaction involving stockholder action, in an atmosphere of complete candor. *Id.* at 281; *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 890 (1985); *Rosenblatt v. Getty Oil Company,* Del.Supr., 493 A.2d 929, 944 (1985). In this context "germane" means "material". *Van Gorkom,* 488 A.2d at 890; *Rosenblatt,* 493 A.2d at 944. An omitted fact is material if a reasonable shareholder would consider it important in deciding whether to sell or retain his stock. A determination of materiality depends upon whether the inclusion of the omitted fact would significantly alter the total mix of information made available to the shareholders. *Lynch,* 383 A.2d at 281; *Rosenblatt,* 493 A.2d at 944; *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976).

### A. Conflict-of-Interest Disclosure Claims

Before addressing the plaintiff's primary disclosure claims (that is, the claims concerning the ICC proceedings and the *pro forma* projections) I turn first to certain disclosure claims of a subsidiary nature. Those claims are predicated upon certain alleged conflicts of interest of Rio Grande's directors and of Morgan Stanley ("the conflict of interest claims").

Preliminarily, it should be noted that the defendants argue that the conflict of interest claims have been abandoned and are no longer in the case. Defendants' view does find support in the record, in that the conflict of interest claims are not alleged as separate grounds for relief in the amended complaint. Also, in a letter dated November 8, 1985, the defendants' counsel advised the Court that the only claims remaining in the case involved the nondisclosure of the ICC proceedings and the *pro forma* projections. Plaintiff's counsel did not dispute that representation, but in his

brief, nonetheless argued the conflict of interest claims as grounds for denying the summary judgment motion. Because of the plaintiff's apparent effort to revive the conflict of interest claims, and to eliminate any uncertainty as to their status, I will address those claims on the merits.

■ Plaintiff first contends, that the Rio Grande Schedule 14D–9 failed to disclose the terms and nature of an employment agreement granted to Rio Grande's Chairman of the Board and President, W.J. Holtman, in connection with the Anschutz merger. It is undisputed that the existence of the Holtman · employment agreement was disclosed in the Schedule 14D–9. Plaintiff's contention, simply put, is that the Schedule 14D–9 should have included an actual copy of the Holtman employment agreement.[4]

In my view the argument has no merit, because the information disclosed in the Schedule 14D–9 was complete. Page one of the Schedule 14D–9 disclosed the essential terms of the Holtman agreement as follows:

> Concurrently with the execution of the Merger Agreement ..., the Board of Directors of the Company has approved and the Company has entered into employment agreements with William J. Holtman, Chairman of the Board and President of the Company and Max E. Ehrlich [not a director of Rio Grande].... The Employment Agreements provide, among other things, for the continuation of employment of Messrs. Holtman and Ehrlich in their present capacities at annual salaries until September 30, 1989 and for the continuation of their existing executive benefits. The Employment Agreements further provide for salary payments to be made, and in certain circumstances employee benefits continued to be provided, to Messrs. Holtman and Ehrlich, or their respective estate, in the event of illness

or disability, death or termination of employment by the Company other than for "cause" or by the employee for "good reason" (as such terms are defined in the Employment Agreements).

Nowhere has plaintiff shown how appending the entire employment agreement to the schedule would have significantly altered the total mix of information already provided to Rio Grande's stockholders. *See Lewis v. Charan Industries, Inc.,* Del. Ch., C.A. 7738, Berger, V.C. (September 20, 1984), slip op. at 7–8.

■ Plaintiff next argues that the Anschutz defendants failed to disclose (in TAC's Offer to Purchase) certain business interrelationships among several Rio Grande individual defendants, Anschutz, and a corporation called Ideal Basic Industries, Inc. ("Ideal"). Plaintiff contends that (i) defendants Shilling, Aydelott, and Blundell, were directors of both Rio Grande and Ideal, (ii) Anschutz is Ideal's principal stockholder and controls approximately 25–30% of its voting stock, and that (iii) in 1982 Ideal paid DRGW an amount equal to 1.1% of Rio Grande's 1982 consolidated gross revenues, and in 1983, gave DRGW almost $4 million dollars. From this plaintiff concludes that "[t]hrough Ideal, ... of which Anschutz is the largest stockholder, Anschutz indirectly is responsible for the payment of millions of dollars to Rio Grande and substantial fees to three of the directors of Rio Grande who also sit on the Board of Directors of Ideal." Plaintiff suggests that Anschutz misrepresented this alleged business relationship in TAC's Offer to Purchase, which stated that TAC had no "business relationship or transaction with [Rio Grande] or any of its executive officers, directors or affiliates which is required to be disclosed ..."

This argument also lacks merit. It is undisputed that Anschutz's approximately 25% voting interest in Ideal was disclosed in the Offer to Purchase. Although Ideal's

---

4. The Holtman employment agreement appeared as an exhibit to the Rio Grande's Schedule 14D–9 as filed with the SEC, but was not included in the copies as mailed to shareholders.

payment to DRGW of an amount equal to 1.1% of Rio Grande's 1982 Consolidated Gross Revenues, was not disclosed, no showing has been made that that information was material, *i.e.*, that it would have been important to a shareholder in deciding whether or not to tender his shares to TAC. *See TSC Industries, Inc.*, 426 U.S. at 449, 96 S.Ct. at 2132. And plaintiff's suggestion that Anschutz's 25% stock interest in Ideal supports an inference that Anschutz has made (directly or indirectly) payments of substantial monies to Rio Grande and fees to its directors, amounts to a conclusory assertion without factual support in the record. *See Lewis v. Straetz*, Del.Ch., C.A. No. 7859, Hartnett, V.C. (Feb. 12, 1986), slip op. at 10–11 [Available on WESTLAW, DE–CS database]; *Weinberger v. UOP Inc.*, Del.Ch., 409 A.2d 1262, 1264 (1979), *rev'd on other grounds*, Del.Supr., 457 A.2d 701 (1983).

■ Similarly unsupported is the plaintiff's claim based upon the fact that three Rio Grande directors held directorships in IntraWest Bank of Denver ("IntraWest") and IntraWest's parent, IntraWest Financial Corp., (a bank with which Rio Grande had a banking relationship) and the fact that defendant Holtman was a director of both IntraWest entities until July 20, 1982. Plaintiff suggests that those relationships created potential conflicts of interest, disclosure of which was required. The difficulty with this argument is that the three Rio Grande directors who served as directors of the IntraWest entities had stepped down from their positions long before Rio Grande entered into the Anschutz merger agreement. Thus, at the time of the Anschutz merger agreement, there was no relationship with IntraWest that might give rise to a potential conflict. Moreover, in what manner such a potential conflict would have been important to a Rio Grande stockholder considering whether or not to tender his shares to Anschutz, has not been shown.

■ Finally, plaintiff contends that Morgan Stanley, Rio Grande's financial advisor in connection with the Anschutz merger, had a conflict of interest (not disclosed in the tender offer materials) that might have tainted its determination that the $50 per share Anschutz tender offer price was fair. Plaintiff argues that although Morgan Stanley considered the potential adverse impact of the Santa Fe-Southern Pacific merger in determining whether the Anschutz tender offer price was fair, it did not take into account the possibly favorable impact of that merger, if Rio Grande obtained the requested trackage rights as conditions to the merger. Morgan Stanley's stated reason was that there was no certainty that any of the requested conditions would be granted. The plaintiff suggests a different motive. Morgan Stanley was the financial advisor to Southern Pacific in connection with the Santa Fe-Southern Pacific merger. Plaintiff argues that "[f]or Morgan Stanley to have assumed that Rio Grande would obtain any rights ... in connection with the Southern Pacific merger proceedings before the ICC probably would have pitted Morgan Stanley against itself".

The plaintiff's suggestion is devoid of any record support. It is correct that Morgan Stanley acted as financial advisor to Rio Grande in connection with the Anschutz merger transaction. It is equally correct that Morgan Stanley advised Southern Pacific in connection with the proposed Santa Fe merger. However, there is no evidence that those two distinct roles occupied by Morgan Stanley were in conflict. That is, there is no showing that Morgan Stanley's role as financial advisor to Southern Pacific would have, or did, cause Morgan Stanley, in its capacity as financial advisor to Rio Grande, to be anything other than objective and fully devoted to Rio Grande's best interests in evaluating the fairness of the $50 Anschutz offering price. Accordingly, the plaintiff has failed to establish the conflict of interest which serves as the predicate for his disclosure claim.

For the foregoing reasons, none of the plaintiff's conflict-of-interest disclosure ar-

guments has merit or establishes a claim upon which relief can be granted.

I now turn to the plaintiff's primary non-disclosure claims, *viz.*, that the Rio Grande defendants failed to make adequate disclosure in the Schedule 14D–9 of (1) the status of the ICC proceedings and their impact upon Rio Grande, and (2) the *pro forma* financial statements submitted by Rio Grande in those proceedings.

*B.   The Nondisclosure of the Status of the ICC Proceedings*

Plaintiff first contends that the Rio Grande directors breached their fiduciary duty to Rio Grande shareholders by not disclosing the status of the ICC proceedings in the Schedule 14D–9 sent to shareholders. It is undisputed that the Schedule 14D–9 did not disclose the existence or status of the ICC proceedings (or the *pro forma* financial statements). Defendants maintain, however, that they had no duty to disclose such information. Alternatively, they contend that even if they had such a duty, it was fully and adequately discharged in this particular case.

■ Defendants claim that they had no duty of disclosure, because there was no requirement to disclose the omitted facts in a Schedule 14D–9. Pointing out that the contents of a Schedule 14D–9 are specifically prescribed by SEC Rule 14D–9 (17 C.F.R. § 240.14d–9), and that Rule 14D–9 enumerates the specific categories of information that must be disclosed,[5] defendants argue that the status of the ICC proceedings is not information that falls within any of the categories prescribed by the Rule.

This argument is, in my view, without legal support. Rule 14d–9 was adopted to implement Section 14(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78n). The purpose of Section 14(d) is to assure that shareholders are provided sufficient information to make an informed decision as to whether to retain or sell their stock in response to a tender offer. *Edgar v. Mite Corp.*, 457 U.S. 624, 632–34, 102 S.Ct. 2629, 2635–37, 73 L.Ed.2d 269 (1982); *Kalmanovitz v. G. Heileman Brewing Co. Inc.*, 595 F.Supp. 1385, 1393 (D.Del.1984), *aff'd*, 769 F.2d 152 (3d Cir.1985); *Gunter v. Ago Intern. B.V.*, 533 F.Supp. 86, 89 (D.Fla.1981). Where, as here, a target company's management recommends acceptance of an outstanding tender offer, the Schedule 14D–9 serves the function of providing stockholders with information material to the recommendation. *See Gulf Corporation v. Mesa Petroleum Co.*, 582 F.Supp. 1110, 1120 (D.Del.1984). Consistent with that purpose, Item 8 of a Schedule 14D–9 requires the directors to disclose:

> Item 8.   *Additional Information To Be Furnished.* Furnish such additional information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not materially misleading.

As defendants correctly note, Item 8 does not require management to disclose facts about a subject company (even if material in some other context) that are unrelated to the purposes of the Schedule. *Cf., Kaufman & Broad, Inc. v. Belzberg*, 522 F.Supp. 35 (S.D.N.Y.1981). What Item 8 does call for is such additional information as may be necessary to make the dis-

---

5. Rule 14d–9 provides in pertinent part that: (1) Such person shall file with the Commission eight copies of a Tender Offer Solicitation/Recommendation Statement on Schedule 14D–9 (§ 240.14d–101), including all exhibits thereto....

   \*   \*   \*   \*   \*   \*

  (c) *Information required in solicitation or recommendation.* Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1, 2, 3(b), 4, 6, 7 and 8 of Schedule 14D–9 (§ 240.14d–101) or a fair and adequate summary thereof: *Provided, however,* That such solicitation or recommendation may omit any of such information previously furnished to security holders of such class of securities by such person with respect to such tender offer. (17 C.F.R. § 240.14d–9)

closures required by the other Items not materially misleading. (Item 8; Rule 14d–9(1)(c)). Thus, the defendants would have been required to disclose the ICC-related information in their Schedule 14D–9 if such information was "... necessary to make the required statements, in light of the circumstances under which they [were] made, not materially misleading." On the present record, it cannot be concluded that the ICC-related information was not of that character.

To begin with, the defendants make no argument that such information is not material. Indeed, in their briefs and at the oral argument, that issue appears to be tacitly conceded. That might be because the status and potential impact of the ICC proceedings were disclosed in some detail in Rio Grande's 1983 Annual Report, in its Quarterly Report and in its May 17, 1984 press release. It would be difficult to square such extensive disclosures, made in Rio Grande's previous communications to its shareholders only months before, with a contention that that same information would not be material to a shareholder considering whether or not to tender his shares into the Anschutz offer. Moreover, the content of those prior disclosures suggests that management believed that, in fact, the ICC-related information was material. Management had previously advised shareholders that if the Santa Fe-Southern Pacific merger were approved without Rio Grande receiving its requested trackage rights, Rio Grande could be placed at a significant competitive disadvantage. That prospect would constitute a reason to tender. Management also advised that if the ICC granted the trackage rights requested by Rio Grande, the company could end up in a far stronger competitive position. That possibility would be a reason not to tender.

■ Accordingly, the status and potential impact of the ICC proceedings would be, at least in a *prima facie* sense, "material" under Item 8 of Schedule 14D–9. That is, its disclosure would be necessary in

order to make the required enumerated disclosures not materially misleading. One such required Schedule 14D–9 disclosure is the Board's recommendation. In Item 4 of their Schedule 14D–9, the Rio Grande defendants represented that the Board had considered "the financial condition, results of operations and business of the Company *on both a historical and prospective basis*," as well as "other recent acquisition transactions, including transactions in the industry in which the Company does business." (Emphasis added.) Since the Company's prospective operations could be significantly affected by the ICC's actions in connection with the prospective Santa Fe-Southern Pacific merger, I cannot say as a matter of law that the omission of the ICC-related information from Item 4 was not materially misleading. That is, I cannot conclude on this summary judgment record that the disclosure of such information would not have significantly altered the total mix of information made available to shareholders in the Schedule 14D–9. Whether or not the Rio Grande defendants had a duty to disclose in the Schedule 14D–9, information about the current status of the ICC proceedings and management's assessment of their potential impact on Rio Grande, is a mixed question of fact and law that must be determined after trial.

■ The defendants next argue, however, that even if they were under a duty to disclose, they discharged that duty because the ICC-related information, even if not set forth in the Schedule 14D–9, had been fully disclosed in previous corporate communications to Rio Grande stockholders during the months preceding the Anschutz transaction, *i.e.*, in Rio Grande's 1983 Annual Report, in its May 30, 1984 Quarterly Report and its May 17, 1984 press release.

The defendants' proposition does find support in federal decisions which hold that a defendant may not be held liable for failing to repeat material information in a proxy statement or similar disclosure document where such omitted information has

been otherwise widely disclosed to investors. *See Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978); *Spielman v. General Host Corp.*, 402 F.Supp. 190, 197–199 (S.D.N.Y.1975), *aff'd per curiam*, 538 F.2d 39 (2d Cir.1976); *Bertoglio v. Texas International Co.*, 488 F.Supp. 630, 642–644 (D.Del.1978); *Fisher v. Plessey Co., Ltd.*, 559 F.Supp. 442, 446–448 (S.D.N.Y.1983).

That proposition, while not unsound in terms of its logic, is not without difficulties in terms of concept or of application in concrete situations. To begin with, the limits and contours of the concept itself have yet to be fully developed. One court has suggested, for example, that there may be instances where an offeror's duty to disclose information in the offering materials will not be relieved by the public availability of the same information, on the theory that investors may consider information contained in the offering materials as more reliable than if contained in other documents. *See Fisher*, 559 F.Supp. at 446; *cf. Spielman*, 538 F.2d at 40–41. Moreover, there are practical problems with the notion that a duty to disclose material facts in a particular document may be satisfied by disclosing those same facts in unrelated documents, where those latter documents were circulated at an earlier point in time. In many public corporations a substantial volume of stock trading may have occurred between the time of the earlier public disclosures and the time of the particular disclosure being challenged. That creates the risk that many of the shareholders who received the earlier public disclosures may no longer be shareholders at the time of the challenged disclosures. As a result, many of the shareholders at the time of the challenged transaction may not have received the prior disclosures.

Those difficulties cannot be resolved at this stage. For even if it is the law that, under some circumstances, the omission of material information in a Schedule 14D-9 can be cured by prior, widespread public disclosure to investors of that same infor-

mation, in this case more extensive development of the facts is required to clarify the application of the law thereto. *See Vanaman v. Milford Memorial Hospital, Inc.*, Del.Supr., 272 A.2d 718, 720 (1970); *Phillips Petroleum Company v. ARCO Alaska, Inc.*, Del.Ch., C.A. No. 7177, Jacobs, V.C. (July 9, 1986), slip op. at 23–24 [Available on WESTLAW, DE–CS database]. That is consistent with the Supreme Court's observation in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976), that issues of materiality are normally not susceptible to summary judgment resolution.

■ To be specific, in this case there are material questions of fact (or mixed fact and law) that cannot be resolved on the present record. These include (a) whether the omitted information was of such a character that its disclosure was required in the Schedule 14D-9, irrespective of its prior public disclosure in other documentary sources; (b) whether there was substantial trading in Rio Grande stock between the time of the prior disclosures relied upon by defendants and the October 1, 1984 announcement of the Anschutz transaction, with the result that the identity of the Rio Grande stockholders at those times was significantly different; and (c) whether the prior disclosures adequately communicated the status and impact of the ICC proceedings to the shareholders.

### c. *Nondisclosure of the Pro Forma Financial Statements*

■ The plaintiff's second ICC-related disclosure contention is that the Rio Grande defendants violated their duty of complete candor by failing to disclose to Rio Grande shareholders the *pro forma* financial projections that were filed with the ICC as part of Rio Grande's Responsive Application. Plaintiff argues that such information was material, relying upon *Flynn v. Bass Brothers Enterprises, Inc.*, 744 F.2d 978 (3rd Cir.1984). In *Flynn*, the Third Circuit held that the existence of a duty to disclose so-called "soft informa-

tion" (*i.e.*, valuation data based upon "forwardlooking" information or estimates, including asset appraisals and income or cash flow projections) should be determined on a case-by-case basis

> ... by weighing the potential aid such information will give a shareholder against the potential harm, such as undue reliance, if the information is released with a proper cautionary note."

744 F.2d at 988.

In making that determination, the *Flynn* court employed a balancing test which involves weighing

> ... the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information.

744 F.2d at 988. Plaintiff argues that the *Flynn* test, when applied to the facts of record, produces material fact disputes that preclude summary judgment.

The defendants contend, in response, that the *Flynn* approach is not, and should not be, the law of Delaware. They urge that this Court should apply the rule generally followed by most federal courts (and cited in two decisions of this Court) namely, that the disclosure of soft information in proxy or tender offer materials is generally not required because such information is inherently unreliable. *See* cases cited in *Flynn*, 744 F.2d at 985; *Starkman v. Marathon Oil Co.*, 772 F.2d 231 (6th Cir.1985); *Radol v. Thomas*, 772 F.2d 244 (6th Cir. 1985); *Lewis v. Charan Industries, Inc.*, Del.Ch., C.A. 7738, Berger, V.C. (Sept. 20, 1984); *Repairman's Service Corp. v. National Intergroup, Inc.*, Del.Ch., C.A. 7811, Walsh, V.C. (March 15, 1985). Defendants argue that as a matter of law the *pro forma* projections are not material, because the assumptions under which they were prepared are so speculative as to make the projections a wholly unreliable, if not misleading, indicator of Rio Grande's prospective value.

The question of whether, and under what circumstances, soft information should be a subject of required disclosure has continued to perplex courts and commentators. Originally the S.E.C. had a long-standing policy against public disclosure of soft information. That policy was based upon concerns that investors might give unwarranted credence to appraisals or projections, and that it was impracticable for the S.E.C. to make determinations on a case-by-case basis as to whether particular soft information is, in each instance, sufficiently reliable to merit disclosure. Many federal courts echoed those concerns by adopting a similarly cautious approach to that subject. *See Flynn*, 744 F.2d at 985; *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1294 (2d Cir.1973). One federal appellate court has articulated that approach in terms of a rule that "... soft information such as asset appraisals and projections must be disclosed only if the reported values are virtually as certain as hard facts." *Starkman*, 772 F.2d at 241.

Recently, however, the law, in response to developing corporate trends such as the increase in mergers, has begun to evolve in the opposite direction towards favoring more disclosure of soft information. *Flynn*, 744 F.2d at 987. The S.E.C. has begun to liberalize its policies. In 1978 the S.E.C. issued a "safe harbor" rule for forward-looking statements, such as future earnings, made in good faith. *See* 17 C.F.R. § 230.175 (1986). In 1980 the S.E.C. authorized disclosure of good faith asset appraisals made on a reasonable basis in proxy contests wherein a principal issue is the liquidation of all or a portion of the target company's assets. *See* Release No. 34–16833, Fed.Sec.L.Rep. (CCH) § 24,117 (May 23, 1980) (codified at 17 C.F.R. § 241.16833 (1983)). This shift in policy is due, in part, to a recognition of the need for such information in tender offer or

merger situations where shareholders must decide whether or not to sell their securities. *See Flynn,* 744 F.2d at 987; Kripke, *Rule 10b–5 Liability and "Material Facts",* 46 N.Y.U.L.Rev. 1061, 1071 (1971).

The Courts of this State have also recognized that certain kinds of information, even if arguably "soft," may be important to shareholders considering whether to tender their shares or to approve a merger. *See In Re Anderson, Clayton Shareholders' Litigation,* Del.Ch., C.A. No. 8387, Allen, C. (June 6, 1986) [Available on WEST-LAW, DE–CS database]. This has occurred in cases involving corporate self-tenders and cash-out mergers that are not contested, where, as a result, the disclosure to shareholders is normally one-sided. In such transactions, where corporate fiduciaries were provided with information that, although arguably "soft," indicated with some degree of reliability that the corporation was worth more than the tender offer or merger price, our Courts have held that such information must be publicly disclosed to stockholders. *See, e.g., Lynch v. Vickers Energy Corp.,* Del.Supr., 383 A.2d 278 (1977) ("going private" tender offer); *Kahn v. United States Sugar Corporation,* Del.Ch., C.A. No. 7313, Hartnett, V.C. (December 10, 1985) (same) [Available on WESTLAW, DE–CS database]; *Weinberger v. U.O.P., Inc.,* Del.Supr., 457 A.2d 701 (1983) (merger).

That background sets the stage for the pivotal question: by what standard should the disclosure of soft information be governed—the *per se* rule that "soft" information is too unreliable to be the subject of mandated public disclosure, or the *Flynn* rule that calls for a balancing approach on a case-by-case basis? On that subject this Court does not write on a totally clean slate. It is correct, as defendants point out, that this Court has previously held in two prior cases that certain soft information was not material, citing the rule that soft information is *generally* too unreliable to be the subject of required public disclosure. *Lewis v. Charan Industries, Inc.,*

*supra,* at 7; *Repairman's Service Group v. National Intergroup, Inc., supra,* at 20. However, nothing in those decisions goes so far as to hold (as defendants suggest) that soft information is *always* so unreliable that under no circumstances should it ever be disclosed. In both *Charan Industries* and *Repairman's Service* the determination of non-materiality was specific to the kind of soft information in issue, and the result was grounded upon a particularized (albeit preliminary) factual determination based on a preliminary injunction record.

Of most significance are recent decisions of this Court that have adopted, either implicitly or explicitly, the *Flynn* standard. In *Edick v. Contran Corp.,* Del.Ch., C.A. No. 7662, Berger, V.C. (March 18, 1986) [Available on WESTLAW, DE–CS database], and in *Wacht v. Continental Hosts, Ltd.,* Del.Ch., C.A. No. 7954, Berger, V.C. (April 11, 1986) [Available on WESTLAW, DE–CS database], this Court, relying upon *Flynn,* denied motions to dismiss claims that certain types of soft information were required to be disclosed, holding that it was unable to conclude that claims based upon a failure to disclose financial projections were clearly without merit either as a matter of law or fact. And in *In Re Anderson, Clayton Stockholders' Litigation,* Del.Ch., C.A. No. 8387, Allen, C. (June 6, 1986) [Available on WESTLAW, DE–CS database], Chancellor Allen, recognizing that it is "not feasible to set forth a single test" to determine whether disclosure of asset appraisals should be required, and that such a "determination must of necessity be made on a case by case basis," adopted the *Flynn* standard as a "reasonably complete ... intermediate guide in attempting to assess whether a shareholder would likely find the appraisal results of actual significance." *Id.* at 33.

To summarize, it appears that the Courts of this State have declined to adopt a *per se* rule that would render nondisclosable all information to which the label "soft" can be affixed. Moreover, this Court, recogniz-

ing that some types of soft information may be misleading if disclosed while other types may be misleading if not disclosed, has adopted the *Flynn* approach as a reasonable method for sifting out soft information that may be considered reliable, from that which cannot be.

This Court is not unmindful of the criticism that have been leveled at the *Flynn* approach from some quarters. *See Anderson, Clayton, supra,* at p. 33, fn. 4. *Flynn* has been criticized on the basis that it injects uncertainty into the process of determining what soft information is (or is not) properly disclosable. One court has characterized *Flynn* as involving a "sort of judicial cost benefit analysis [that is] uncertain and unpredictable, and ... neglects the role of the market in providing shareholders with information regarding the target's value through competing tender offers." *Starkman v. Marathon Oil Co.,* 772 F.2d at 242.

That criticism, however, does not advance the analysis very far. For the underlying problem is that there is no scientific way to eliminate uncertainty from this process. Any determination of "materiality" (itself an imprecise concept containing mixed elements of fact and law) necessarily involves some degree of uncertainty. The alternative—proscribing altogether the disclosure of all "forward looking" information containing either opinions or projections of values—is unacceptable, because it would deprive shareholders of information that both our Supreme Court and the S.E.C. have recognized may be critical to an informed, reasoned shareholder decision as to how to vote or whether to tender. The analytically relevant question, therefore, is not whether uncertainty can be eliminated but how it can be minimized. Under *Flynn* it will be clear in many cases whether the questioned information should be disclosed. In cases of genuine doubt, the uncertainty can be mitigated where the

"soft" information is disclosed but qualified with an appropriate cautionary explanation. *See Flynn,* 744 F.2d at 988; *Lynch v. Vickers Energy Corp.,* 383 A.2d at 281. As stated in *Anderson, Clayton, supra,* the *Flynn* approach strikes a workable balance between the drafter's need for predictability and the shareholders' need for material information.

■ What remains is to apply the *Flynn* criteria to the instant facts. That analysis leads to the conclusion that in certain respects the *pro formas* were sufficiently reliable to require disclosure, in other respects, they were not, and as to the remainder, there is no evidence from which a conclusion can be drawn one way or the other.

Two factors suggest the reliability of the *pro formas:* their relevance to the stockholders' decision as to whether or not to tender to Anschutz, and the qualifications of the preparer of the projections. As previously indicated, a stockholder considering whether or not to tender his Rio Grande shares would consider it important to know that if the ICC granted the requested trackage rights as a condition to the Santa Fe-Southern Pacific merger, Rio Grande could emerge in a stronger competitive position. The *pro formas* (if otherwise reliable) would arguably enable a stockholder to quantify in dollar terms, at least to some extent, the company's future prospects if the trackage rights were granted which, in turn, would help him to decide whether to remain a stockholder in Rio Grande or to accept the $50 per share tender offer price. The reliability of the *pro formas* is also supported by the qualifications of the preparer, Mr. Carl H. Smith, Rio Grande's Director of Management and Planning.[6]

Other factors, however, raise serious questions as to the reliability of the *pro formas.* The first is the purpose for which

6. The holder of a Masters of Business Administration, Mr. Smith is responsible for preparing and interpreting Rio Grande's operating, cash and working capital budgets, developing forecasts and related analyses, corporate planning, performing cost and profitability analyses of the company's traffic and being familiar with costing methodology.

the projections were originally intended. This is not a case where the questioned information was prepared for valuation purposes and to assist management in making a business decision as to the amount of the tender offer or merger consideration. Here the *pro formas* were prepared for the purpose of inducing the ICC to grant Rio Grande significant financial benefits in connection with the proposed Santa Fe-Southern Pacific merger. The *pro formas* were not, in other words, intended to be relied upon by management or stockholders as evidence of the company's value, but, rather, were intended as an "advocacy" document. That factor cuts against their reliability for mandatory disclosure purposes, where, as here, the issue is the company's value in connection with a challenged merger transaction.

A related factor which seriously detracts from the reliability of the *pro formas* is the degree of subjectivity or bias reflected in their preparation. In this case, the earnings projections reflected a "best case" assumption that the ICC would grant all of Rio Grande's conditions. That assumption was highly speculative, and no adjustment was made to reflect the probability that the ICC might grant only some (or perhaps none) of those conditions. There are many other assumptions that Rio Grande also had to make to generate the projections. Because of the uncertain nature of those variables,[7] the impossibility of accurately predicting how any combination of them would ultimately be resolved, or when a decision would be rendered by the ICC, Morgan Stanley gave virtually no weight to the earnings projections in arriving at its opinion that the Anschutz offer was fair.

There is no evidence that Morgan Stanley's determination that the *pro formas* were unreliable, was the product of anything other than an objective, professional judgment by a disinterested professional advisor.

The speculative nature of the assumptions upon which the *pro formas* rested, also adversely affected the reliability of some of the underlying factual data upon which the projections were based. To the extent the calculations used to arrive at the earnings figures were based upon hard information such as train size, traffic volume, number of trains, and actual operating results, the factual data would be reliable. However, the projection calculations were also based upon certain estimates and assumptions. To the extent that the data underlying the projections represented an admixture of facts, assumptions and estimates, their reliability would, of necessity, be diminished.

The remaining factors—the uniqueness of the information and the availability to stockholders of more reliable information—are not addressed by any evidence of record. While common sense would suggest that the *pro formas* were unique and that no other, more reliable, projections were available, that fact has not been established, and I decline to make findings based upon speculation.

Having considered and weighed the foregoing factors, I conclude that the plaintiff has failed to establish that the *pro formas* had sufficient indicia of reliability to require disclosure. The burden of proving the materiality of alleged factual omissions

---

7. These variables included whether the ICC would grant, in full or in part, the trackage and purchase rights Rio Grande was seeking; the initial cost of the trackage and purchase rights Rio Grande was seeking; the cost of equipment required to haul any new traffic derived from these trackage and purchase rights; the fixed annual rental payment incurred in connection with the trackage rights; the capital and labor costs that Rio Grande would incur in servicing and maintaining the trackage rights that might eventually be obtained, if any; the future for the various commodity markets Rio Grande hoped to serve with the trackage and purchase rights it hoped to obtain; the amount of the traffic for those markets which Rio Grande hoped to obtain; the timing of the final ICC decision and whether that decision would be held in abeyance pending further litigation; and the configuration of what is known as the Rio Grande map, a term used to describe the current ownership of adjacent and competing lines to Rio Grande.

rests, in this context, upon the plaintiff. *Lowenschuss v. Kane*, 520 F.2d 255, 268 (2d Cir.1975); *see Ronson Corporation v. Liquifin Aktiengesellschaft Liquigas, SpA*, 497 F.2d 394, 395 (3d Cir.1974); *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 703 (1983). That burden has not been met here.

### III.

Plaintiff's final claim is that the TAC and Anschutz defendants are liable to the class for having aided and abetted the Rio Grande defendants in their alleged breach of fiduciary duties to the Rio Grande stockholders. The TAC and Anschutz defendants contend that the plaintiff has failed to state a claim for which relief can be granted. I agree.

A claim for civil conspiracy (sometimes called "aiding and abetting") requires that three elements be alleged and ultimately established: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty and (3) a knowing participation in that breach by the defendants who are not fiduciaries. *Gilbert v. El Paso Co.*, Del.Ch., 490 A.2d 1050, 1057 (1984).

Here, it is admitted that the Rio Grande defendants stood in a fiduciary relationship to the plaintiff class. Whether or not the Rio Grande defendants breached their fiduciary duty is an issue that, for the reasons stated in Part II of this Opinion, must be resolved at trial. Even if, *arguendo*, a breach is established, the Court is satisfied that the plaintiff cannot establish that the TAC and Anschutz defendants "knowingly participated" in that breach under any state of facts reasonably inferrable from the amended complaint.

The plaintiff alleges no facts from which it can be reasonably inferred that Anschutz or TAC played any role in the Rio Grande defendants' decision not to disclose the existence of the ICC proceedings or the *pro forma* financial projections. Plaintiff alleges only that Anschutz and TAC issued a joint press release, that Anschutz failed to disclose the alleged connections between the defendant directors and Ideal, that Anschutz had access to Rio Grande's Responsive Application, that Anschutz disclosed certain projections in their Offer to Purchase but did not disclose the *pro formas* in question, and that Anschutz described in their Offer to Purchase that Rio Grande was subject to the jurisdiction of the ICC, but did not mention the ICC proceedings themselves. Even if viewed in the light most favorable to the plaintiff, those facts do not support a claim that the TAC and Anschutz defendants participated at all (let alone knowingly participated) in any disclosure violations by the Rio Grande defendants. *See Repairman's Service Corp. v. National Intergroup Inc.*, Del.Ch., C.A. 7811, Walsh, V.C., slip op. at 22–23 (March 15, 1985); *cf. Gilbert v. El Paso Co.*, Del. Ch., 490 A.2d 1050 (1984). Accordingly, the plaintiff has failed to state a legally cognizable claim against the TAC and Anschutz defendants.

\* \* \*

For the reasons discussed above, TAC's motion to dismiss and the Rio Grande defendants' motion for summary judgment are granted as to all of the plaintiff's claims, except for the claim against the Rio Grande defendants based upon the nondisclosure of the status and effect of the ICC proceedings involving the Santa Fe-Southern Pacific merger. As to that latter claim, the Rio Grande defendants' motion for summary judgment is denied.

IT IS SO ORDERED.