## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAUL DENT, On Behalf of Himself and All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 7950-VCP |
| RAMTRON INTERNATIONAL CORPORATION, ERIC A. BALZER, THEODORE J. COBURN, JAMES E. DORAN, WILLIAM L. GEORGE, WILLIAM G. HOWARD Jr., ERIC KUO, CYPRESS SEMICONDUCTOR CORPORATION and RAIN ACQUISITION CORP., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: March 25, 2014
Date Decided: June 30, 2014

James R. Banko, Esq., Raj Srivstan, Esq., FARUQI & FARUQI, LLP, Wilmington, Delaware; *Attorneys for Plaintiff Paul Dent.*

Raymond J. DiCamillo, Esq., Brock E. Czeschin, Esq., Scott W. Perkins, Esq., Nicole C. Bright, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants Ramtron International Corporation, Eric A. Balzer, Theodore J. Coburn, James E. Doran, William L. George, William G. Howard Jr. and Eric Kuo.*

A. Thompson Bayliss, Esq., ABRAMS & BAYLISS, LLP, Wilmington, Delaware; Steven Guggenheim, Esq., WILSON SONSINI GOODRICH & ROSATI, Palo Alto, California; *Attorneys for Defendants Cypress Semiconductor Corporation and Rain Acquisition Corp.*

**PARSONS, Vice Chancellor.**

This action arises from the acquisition of a technology company by a third party, strategic buyer. The plaintiff, a former stockholder of the acquired entity, makes the same allegations that have become routine in the ubiquitous shareholder litigation that immediately follows the announcement of any public company merger or acquisition transaction: the target board breached its fiduciary duties by failing to maximize the value of the entity, locking up the deal impermissibly in the acquirer's favor, and disseminating a proxy statement containing material misstatements or omissions, and the acquiring company aided and abetted those breaches. The challenged transaction was completed in 2012. At this time, the plaintiff seeks, among other monetary relief, quasi-appraisal to obtain an award of the fair value of his shares as of the date of the acquisition.

Two groups of defendants, the target company's board of directors and the acquirer, each have moved to dismiss the complaint on the grounds that the plaintiff has failed, in every count of the complaint, to state a claim upon which relief can be granted.

Having considered the parties' briefs and heard argument on the motions, I conclude that the defendants' motions to dismiss should be granted, and the complaint dismissed in its entirety.

## I.    BACKGROUND

### A.    The Parties

Plaintiff, Paul Dent, is a stockholder of Ramtron International Corporation ("Ramtron," or the "Company"), and purportedly has been a Ramtron stockholder at all times relevant to this litigation.

1

Defendant Ramtron is a Delaware corporation engaged in the business of designing, developing, and marketing specialized semiconductor products. Ramtron is named as a necessary party in connection with Dent's request for equitable relief.

Defendants Eric A. Balzer, Theodore J. Coburn, James E. Doran, William L. George, William G. Howard, and Eric Kuo (collectively, the "Individual Defendants") comprised Ramtron's Board of Directors (the "Board") until October 10, 2012. On that date, Belzer, Doran, and Kuo resigned from the Board.[1]

Defendant Cypress Semiconductor Corporation ("Cypress") is a Delaware corporation headquartered in San Jose, California. Cypress is a world leader in USB controllers and SRAM memories and operates in numerous market segments, including consumer, mobile handsets, industrial, and military. Ramtron is now a wholly owned subsidiary of Cypress.

Defendant Rain Acquisition Corp. ("Rain," and together with Ramtron, the Individual Defendants, and Cypress, "Defendants") is a wholly owned Cypress subsidiary, which was formed to effectuate the merger between Cypress and Ramtron.

---

[1] Jack L. Saltich is not listed in the caption of this litigation as a defendant. He is identified as a defendant, however, in paragraph 20 of the Verified Second Amended Class Action Complaint (the "Complaint"). According to Defendants, the claims against Saltich should be dismissed because he ceased being a director of Ramtron before the Board approved the merger at issue in this litigation. Plaintiff did not respond to Defendants' argument in this regard either in its briefing or at oral argument. Therefore, Plaintiff has waived its right to challenge Saltich's dismissal. *See Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

2

## B. Facts[2]

### 1. Cypress first approaches Ramtron

On March 8, 2011, Cypress made an unsolicited offer to acquire Ramtron for $3.01 per share, which represented a 37% premium to the Company's share price at the time. In response, on March 11, Ramtron created a Strategic Transaction Committee (the "2011 Committee") consisting of Howard, Balzer, Kuo, and Coburn to evaluate Cypress's offer. After meeting on several occasions with the Company's outside legal and financial advisors, on March 21, 2011, the 2011 Committee informed Cypress that it had rejected Cypress's offer as inadequate and that the Company would not be making a counterproposal.

Soon thereafter, the Company raised additional capital through a dilutive public stock offering at a net price of $1.79 per share. After the public offering, Ramtron's stock price traded as low as $1.65 per share.

### 2. Cypress approaches Ramtron again

Over a year after having its initial offer rejected, on June 12, 2012, Cypress renewed its efforts to acquire Ramtron with a cash offer of $2.48 per share. Similar to Cypress's March 2011 offer, the June 2012 offer represented a 37% premium to the Company's share price at the time. In its offer, which was made public, Cypress indicated that it preferred to proceed through a negotiated agreement, but that it was

---

[2]  The facts are derived from Dent's complaint, and the documents integral to it. *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 96 n.2 (Del. 2013).

prepared to take the necessary actions to acquire Ramtron even if an agreement could not be reached.

In response, the Board formed a new Strategic Transaction Committee (the "2012 Committee") consisting of Defendants Howard, Balzer, Coburn, Doran, and George to consider, among other things, Cypress's new offer. On June 17, the 2012 Committee decided to reject the offer, and authorized Needham & Company ("Needham"), the Company's financial advisor, to begin contacting third parties who potentially would be interested in engaging in a transaction with Ramtron. The following day, the Company filed a Schedule 14D-9 with the U.S. Securities and Exchange Commission ("SEC") advising its stockholders not to tender their stock to Cypress at the $2.48 per share tender price.

Also on June 18, Ramtron invited Cypress to participate in its evaluation of strategic alternatives, and sent a draft confidentiality agreement to Cypress's financial advisor to initiate such a process. Cypress, however, declined to execute the confidentiality agreement or otherwise participate in the Company's review of strategic alternatives.

On June 21, 2012, Cypress commenced a tender offer for Ramtron's shares at a price of $2.68 per share. In a July 5, 2012, Schedule 14D-9 filing, the Company again recommended that its stockholders reject Cypress's offer. The June 21 tender offer was scheduled to expire on July 19, 2012, but was renewed on July 20, August 6, and August 20, 2012, after failing to generate sufficient interest from the Company's stockholders.

4

During this same timeframe, the Company continued to explore various strategic alternatives. This included contacting 24 potential purchasers, and entering into confidentiality agreements with seven entities that showed interest in completing a deal with Ramtron. At no time did any of these, or any other, entities make an offer to acquire the Company.

On August 27, 2012, Cypress again raised its offer to acquire Ramtron, this time to $2.88 per share. On September 4, the 2012 Committee authorized Needham to inform Cypress's financial advisor that an offer of $3.50 per share would position Cypress well among the Company's strategic alternatives. Cypress, however, never so much as even countered this overture. On September 8, 2012, after discussing Cypress's most recent proposal with its legal and financial advisors, the Board voted unanimously to reject that offer and recommend that its stockholders not tender their shares at the price Cypress was offering. The Board disclosed this decision and recommendation in a September 10, 2012 Schedule 14D-9 filing.

### 3. Cypress and Ramtron negotiate and reach an agreement

On September 15, 2012, Ramtron's Board authorized Needham to make a counterproposal under which Cypress would acquire the Company for $3.25 per share. In negotiations the following day, Cypress offered to raise its bid for Ramtron to $3.01. Ramtron and Cypress continued to negotiate, and on September 19, 2012, the parties

5

issued a joint press release stating that they had reached an agreement for Cypress to purchase the Company for $3.10 per share in an all-cash tender offer (the "Initial TO").[3]

On September 25, 2012, Ramtron filed a schedule 14D-9 recommending that its stockholder tender their shares into the Initial TO. The Initial TO then was launched, and it expired at midnight on October 9, 2012. The following day, Cypress issued a press release stating that it had acquired 23.3 million Ramtron shares through the Initial TO, thus increasing its ownership position in the Company to 72%. Cypress also announced that it would be commencing a subsequent offering period (the "Subsequent TO"), expiring on October 17, 2012, for all remaining untendered Ramtron shares.

On October 18, 2012, Cypress announced that it acquired only an additional 6% of Ramtron's shares in the Subsequent TO. Because at 78% ownership Cypress did not have sufficient shares to effectuate a short-form merger with Ramtron under Delaware law, it filed an amendment to its Schedule TO stating that Defendants would be scheduling a vote for Ramtron's stockholders to vote on a long-form merger.

Ramtron filed its definitive Proxy related to the stockholder vote on October 29, 2012 (the "Proxy"). The Proxy contained summaries of four financial analyses conducted by Needham, including a discounted cash flow ("DCF") analysis based on Ramtron's management projections. The projections were not included in the Proxy. Of

---

[3] Cypress's offer of $3.10 per share represented a 71% premium over the closing price of Ramtron's stock on June 11, 2012, the last trading day before the public announcement of Cypress's offer to acquire the Company and an 8% premium over the closing price of Ramtron's stock on September 18, 2012, the last trading day before the announcement of the Initial TO.

6

the four analyses, the transaction consideration of $3.10 was below only the $3.57 to $5.01 per share valuation range implied by the DCF.

On November 20, 2012, Ramtron's stockholders approved the Company's merger with Cypress.[4]

## C. Procedural History

Dent filed his initial complaint together with a motion for expedited proceedings on October 15, 2012. He amended his complaint one week later on October 22. On November 5, 2012, Dent moved for a preliminary injunction to enjoin the proposed merger between Ramtron and Cypress. Later that same day, in a bench ruling, I granted Dent's motion for expedition and scheduled a preliminary injunction hearing on November 19, 2012. After full briefing, I heard argument on Dent's motion for preliminary injunctive relief on November 19 and, in a bench ruling, I denied that motion. On January 11, 2013, Dent filed the Complaint, which, on January 24, 2013, the Individual Defendants and Cypress moved separately to dismiss. After full briefing, I heard argument on those motions on March 25, 2014. This Memorandum Opinion constitutes my ruling on Defendants' motions to dismiss.

## D. Parties' Contentions

Dent asserts three claims against various combinations of Defendants. In Count I, Dent alleges that the Individual Defendants breached their fiduciary duties by failing to engage in a competitive sales process that maximized shareholder value (*i.e.*, breached

---

[4]     Because by this time Cypress had obtained ownership of over 50% of Ramtron's shares, the outcome of the vote was guaranteed to be in favor of the transaction.

7

their *Revlon* duties) and by failing to fully disclose material information in the Proxy. Count II is a claim against Cypress and Rain for aiding and abetting the Individual Defendants' alleged breaches of their fiduciary duties. Finally, in Count III, Dent contends that he and Ramtron's other stockholders are entitled to quasi-appraisal for their shares because the deficient Proxy deprived the Company's stockholders of the ability to make an informed decision about whether to dissent from the transaction and perfect their appraisal rights.

Defendants have moved to dismiss under Court of Chancery Rule 12(b)(6). As to Dent's breach of fiduciary duty claim, the Individual Defendants argue that the Complaint does not support an inference that they breached any of their duties to the Company, and that, at most, the Complaint states a claim for breach of the duty of care for which Dent cannot recover monetary damages because of the Company's 102(b)(7) exculpatory charter provision. Regarding the claim for aiding and abetting, Cypress and Rain assert that the Complaint fails to allege adequately any underlying breach of fiduciary duty, and that in any event, the Cypress-Ramtron negotiation was conducted at arm's-length, which negates any inference that Cypress or Rain knowingly participated in any breach of fiduciary duty by the Individual Defendants. Finally, as to Dent's claim for quasi-appraisal, Defendants aver that the Company's stockholders received adequate information in the Proxy to make an informed decision about whether to accept the transaction consideration or to seek appraisal, and thus, have failed to state a viable cause of action in that regard.

8

## II.        ANALYSIS

### A.        Legal Standard

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. As recently reaffirmed by the Delaware Supreme Court,[5] "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[6] That is, when considering such a motion, a court must:

> accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[7]

This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[8] If the well-pled factual allegations of the complaint would entitle the plaintiff to relief under a reasonably conceivable set of circumstances, the court must deny the motion to dismiss.[9] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-

---

[5]    *See Winshall v. Viacom Int'l, Inc.*, 2013 WL 5526290, at \*4 n.12 (Del. Oct. 7, 2013).

[6]    *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (footnote omitted).

[7]    *Id.* (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[8]    *Id.* at 537 & n.13.

[9]    *Id.* at 536.

moving party."[10]  Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[11]

### B.  Individual Defendants' Breach of Fiduciary Duty

#### 1.  *Revlon* claim

##### a.  Legal standard

Corporate directors have "an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders."[12]  When directors have commenced a transaction process that will result in a change of control, a reviewing court will examine whether the board has reasonably performed its fiduciary duties "in the service of a specific objective: maximizing the sale price of the enterprise."[13]  So-called *Revlon* duties are only a specific application of directors' traditional fiduciary duties of care and loyalty in the context of control transactions.[14]  In that regard, if the corporation's certificate contains an exculpatory provision pursuant to 8 *Del. C.*

---

[10]  *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[11]  *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

[12]  *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 360 (Del. 1993) (citations omitted).

[13]  *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del. 2001) (citing, among other cases, *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.,* 506 A.2d 173, 182–83 (Del. 1986)).

[14]  *Wayne Cty. Empls.' Ret. Sys. v. Corti,* 2009 WL 2219260, at *10 (Del. Ch. July 24, 2009) (citing *McMillan v. Intercargo Corp.,* 768 A.2d 492, 502 (Del. Ch. 2000)), *aff'd,* 966 A.2d 795 (Del. 2010) (TABLE).

§ 102(b)(7) barring claims for monetary liability against directors for breaches of the duty of care, the complaint must state a nonexculpated claim, *i.e.,* a claim predicated on a breach of the directors' duty of loyalty or bad faith conduct.[15]

A factual showing that, for example, a majority of the board of directors was not both disinterested and independent would provide sufficient support for a claim for breach of loyalty to survive a motion to dismiss.[16] "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[17] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences,"[18] such as where one director effectively controls another.[19] Moreover, as to any individual director, the disqualifying self-interest or lack of independence must be material, *i.e.,* "reasonably likely to affect the decision-making process of a reasonable person . . . ."[20]

---

[15] *See Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 239–40 (Del. 2009); *Corti,* 2009 WL 2219260, at *10.

[16] *In re NYMEX S'holder Litig.,* 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009) (citing *In re Lukens S'holders Litig.,* 757 A .2d 720, 728 (Del. Ch. 1999)).

[17] *Rales v. Blasband,* 634 A.2d 927, 936 (Del. 1993) (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)).

[18] *Aronson,* 473 A.2d at 816.

[19] *Orman v. Cullman,* 794 A.2d 5, 24 (Del. Ch. 2002).

[20] *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 363 (Del. 1993).

Well-pled allegations that the board did not act in good faith also would state a claim for breach of the duty of loyalty sufficient to survive a motion to dismiss.[21] In general, "bad faith will be found if a 'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'"[22] Alternatively, notwithstanding approval by a majority of disinterested and independent directors, a claim for breach of duty may exist "where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[23]

## b. Dent has failed to allege a viable *Revlon* claim against the Individual Defendants

It is undisputed that at all times relevant to this litigation Ramtron's charter contained a 102(b)(7) exculpatory provision. Because Ramtron and Cypress were unrelated and independent of one another before agreeing to the transaction, Dent's *Revlon* claim against the Individual Defendants can survive a motion to dismiss only if the Complaint supports a reasonable inference that the Individual Defendants breached their duty of loyalty or acted in bad faith (*i.e.*, committed a nonexculpated breach of fiduciary duty). The Complaint fails to allege sufficiently any such nonexculpated

---

[21]     *In re NYMEX S'holder Litig.,* 2009 WL 3206051, at *6 (footnote omitted).

[22]     *Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 243 (Del. 2009) (quoting *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del. 2006)).

[23]     *Crescent/Mach I P'rs, L.P. v. Turner,* 846 A.2d 963, 981 (Del. Ch. 2000) (quoting *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1247 (Del. 1999)).

12

breach, and, therefore, Dent's *Revlon* claim against the Individual Defendants must be dismissed.

As to the duty of loyalty, Dent alleges no facts that call into question the independence or disinterestedness of a majority of the Board. There are no allegations that any director stood on both sides of the transaction or that any director received any consideration from the transaction that was not shared *pro rata* among Ramtron's other stockholders. In addition, there are no allegations that any of the Individual Defendants' directorships were material to them or that any one of the Individual Defendants dominated or otherwise controlled the Ramtron Board.[24] Based on the absence of well-pled allegations that a majority of Ramtron's board lacked independence or had an impermissible personal interest in the transaction with Cypress, Dent has failed to allege sufficiently that the Individual Defendants' agreement to a deal with Cypress implicates the duty of loyalty.

The Complaint is equally deficient with respect to allegations that the Individual Defendants approved the transaction with Cypress in bad faith. Under Delaware law, "there is a vast difference between an inadequate or flawed effort to carry out fiduciary

---

[24] There is an allegation, discussed in greater detail *infra*, that Defendant George was a member of a "manufacturing advisory board" at Cypress when Ramtron and Cypress agreed to a transaction. Compl. ¶ 11. Even assuming the truth of this allegation, which the briefing suggests is unlikely, and even assuming further that George's role on the manufacturing advisory board was material to him, George was one of six members of Ramtron's board, and there are no allegations that George, in any way, controlled or dominated any of the other indisputably independent and disinterested directors.

13

duties and a conscious disregard for those duties."[25]  In that regard, an "extreme set of facts" is "required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."[26]  Here, Cypress's public efforts to acquire the Company spanned nearly two years.  Over that period of time, the Individual Defendants, among other things, retained outside legal and financial advisors, rejected two Cypress offers as inadequate, contacted 24 potential purchasers with the assistance of their legal and financial advisors, and negotiated an increase in Cypress's offer price from $2.88 to $3.10 per share.  Based on the Individual Defendants' actions, it is not reasonably conceivable that Dent could prove on a full evidentiary record that the Board consciously disregarded its fiduciary duties to Ramtron's stockholders when considering, and eventually agreeing to, a sale of the Company to Cypress.

The allegations that the Company repeatedly rejected Cypress's advances impermissibly do not compel a different conclusion.  There are no allegations that when Cypress first approached the Company in 2011 the Board  already had decided to sell Ramtron or effectuate a change of control transaction.  In other words, the "duty of the [B]oard had [not] changed from the preservation of [Ramtron] as a corporate entity to the maximization of the [C]ompany's value at a sale for the stockholder's benefit,"[27] and the Board's conduct was subject to business judgment, not *Revlon*, scrutiny.  Dent has

---

[25]  *Id.*

[26]  *Id.*

[27]  *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986).

14

alleged no facts that would support a reasonable inference that he could overcome the presumptions of the business judgment rule with respect to the Ramtron Board's independent and disinterested decision to reject Cypress's offer to purchase the Company at a time when the Company was not for sale.

Dent's argument in this regard fares no better in the context of the 2012 sales process, by which time the Board had assumed *Revlon* duties. Initially, at least, the Board continued to "say no" to Cypress, and its conduct appears to have contributed to Cypress raising its offer for the Company. At the same time, however, it also was conducting board meetings, meeting with its advisors, and reaching out to 24 other potential acquirers with the assistance of its outside legal and financial advisors. Even if imperfect, the Board's alleged conduct does not support a reasonable inference that it consciously disregarded its duties to Ramtron's stockholders. Plaintiff's argument that the Company should have engaged Cypress earlier in the sales process amounts to little more than an *ex post* quibble with the independent and disinterested Board's negotiation strategy. Even assuming that the Board undertook the wrong strategy, however, that fact, without more, does not make it reasonably conceivable that the Board's decision to sell the Company to Cypress was made in bad faith. Therefore, I reject this aspect of Dent's *Revlon* claim.

Dent also emphasizes that the $3.10 per share transaction consideration was below Needham's DCF value range. That fact, in the context of this dispute, however, does not support a reasonable inference that the price was "so far out of bounds" that it could only be explained by bad faith. Taking as true the allegations in the Complaint,

15

Needham conducted three other valuation analyses in addition to the DCF, and the transaction price of $3.10 fell within the valuation range implied by each of those other analyses. Moreover, the Board did not simply accept a price of $3.10 per share; it made multiple counterproposals, and, even without the leverage of another offer, got Cypress to increase its offer significantly from its original June 2012 bid. Accordingly, I conclude that the allegations in the Complaint fall well short of what is necessary to support a reasonable inference that the Individual Defendants conceivably acted in bad faith by agreeing to a transaction with Cypress at $3.10 per share.

### c. The purported deal protection devices also do not support a reasonable inference of bad faith

In the Complaint, Dent alleges that the Board adopted several "preclusive" and "draconian" deal protection devices, in breach of their fiduciary duties, to ensure the transaction with Cypress was completed. These deal protection devices were: (1) a no-solicitation provision; (2) a standstill provision; (3) a change in recommendation provision; (4) information rights for Cypress; and (5) a $5 million termination fee.[28] But, none of these deal protection devices, considered separately or together, support a reasonable inference that the Individual Defendants acted in bad faith.

Before examining the actual deal protection devices at issue here, I note two salient contextual points that strongly weigh against finding that Dent has alleged adequately that the deal protection devices support a reasonable inference of bad faith. First, Ramtron was "in play" for several months before ever agreeing to a transaction

---

[28] The termination fee equated to 4.5% of the deal's total equity value.

16

with Cypress. Up to the time that Ramtron and Cypress agreed to a deal, there were no deal protection devices in place, and, thus, there was nothing preventing or inhibiting any of the 24 entities that Ramtron contacted from making a viable offer for the Company or any other entity from making an unsolicited offer. Yet, notwithstanding the fact that Cypress's pursuit of Ramtron was known publicly and there was nothing restricting any entity from approaching the Company or the Company's ability to consider any such approach, no one appears to have met or exceeded Cypress's offer. Thus, it is unclear what other realistic opportunities the Board precluded itself from by accepting the deal protection devices contained in the agreement with Cypress.

Second, while the Complaint half-heartedly makes the conclusory accusations that the deal protection devices were "draconian" and "preclusive," Dent makes no effort to explain how the devices at issue work in such a harmful manner. Instead, the Complaint contains long block quotes of the relevant sections of the merger agreement without any non-conclusory justification for Dent's assertion that those provisions are problematic under Delaware law. While the unacceptably conclusory nature of Dent's allegations alone may provide an adequate basis to dismiss his claims with respect to the deal protection devices, I nevertheless have reviewed the relevant provisions of the merger agreement and find that Dent has failed to state a viable claim in this regard.

The no-solicitation provision at issue does not appear to deviate in any meaningful way from similar types of provisions that repeatedly have been approved by this Court.[29]

---

[29] *See ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95, 106 (Del. Ch. 1999) (describing the no-solicitation clause at issue as a type of restriction that "is perfectly

17

Moreover, the no-solicitation provision is coupled with a reasonable "fiduciary out" clause, which mitigates any "preclusive" restrictions on the Board's ability to consider other potentially value-maximizing transactions. Thus, Dent's argument that this feature of the merger agreement supports a reasonable inference that the Individual Defendants consciously disregarded their fiduciary duties is without merit.[30]

Dent also has made no effort to explain why the merger agreement's change in recommendation section was impermissible. By its plain terms, the Board was permitted to change its recommendation on the Cypress transaction if it believed in good faith that another offer was better for the Company's stockholders. This right was subject to the unremarkable and customary procedural restraints of notice and matching rights in favor of Cypress. Dent has cited no authority in support of his argument that these restraints were unreasonable. To the contrary, there is ample precedent for the proposition that the three-day notice period[31] and matching rights[32] given to Cypress were reasonable under

understandable, if not necessary, if good faith business transactions are to be encouraged"); *McMillan v. Intercargo Corp.*, 768 A.2d 492, 506 (Del. Ch. 2000) (stating that "[t]he presence of [a standard no-shop] type of provision in a merger agreement is hardly indicative of a *Revlon* (or *Unocal*) breach.") (internal citations omitted).

[30]    The same holds true for the merger agreement's "standstill" provision. Dent does not cite any authority or present any cogent argument as to how the standstill provision at issue, which also included a reasonable fiduciary out, was atypical or unreasonable.

[31]    *See In re Micromet, Inc. S'holders Litig.*, 2012 WL 681785, at *9 (Del. Ch. Feb. 29, 2012) (upholding four-day notice period).

[32]    *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *21 n.141 (Del. Ch. May 20, 2011) ("no shop and matching rights clauses of the kind

18

the circumstances of this litigation.[33]  Even assuming these restraints were problematic, however, there is nothing about them that would enable this Court to draw a reasonable inference that they were adopted or agreed to in bad faith.

The assertion that the termination fee in this case supports an inference that the Individual Defendants acted in bad faith is similarly unavailing.  At 4.5% of the transaction's equity value, it is highly unlikely that the termination fee here was unreasonably high.[34]  Moreover, even if the termination fee were deemed excessive, it certainly does not approach a level that would suggest the Company's board consciously disregarded their duties to Ramtron's stockholders in agreeing to it.  Nor can it be said that the termination fee was so egregious that it only can be explained by the Individual Defendants having acted in bad faith.  Thus, the termination fee cannot form the basis of an actionable claim against the Individual Defendants for money damages.

---

included in the Merger Agreement are customary in public company mergers today."); *In re Toys "R" Us, Inc. S'holder Litig.*, 877 A.2d 975, 1017 (Del. Ch. 2005) ("neither a termination fee nor a matching right is *per se* invalid. Each is a common contractual feature").

[33] There also is nothing unreasonable about Cypress's information rights in the agreement.  In essence, Cypress has the right to be notified if another entity expresses interest in acquiring Ramtron.  Dent offers no support for his assertion that this facially reasonable provision somehow endows Cypress with an unreasonable advantage over other potential acquirers of Ramtron.

[34] *In re Topps Co. S'holders Litig.*, 926 A.2d 58, 86 (Del. Ch. 2007) (upholding 4.3% termination fee); *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *7 (Del. Ch. Dec. 18, 2009) ("The provisions that plaintiffs attack [including a termination fee of over 4% of the merger's equity value] have been repeatedly upheld by this Court.").

Finally, when considered together, the deal protection devices challenged here do not support a reasonable inference that the Individual Defendants conducted themselves in bad faith. Similar, if not more potent, combinations of deal protection devices often have been upheld by this Court.[35] Moreover, to the extent the deal protection devices at issue in this dispute go beyond those that previously have been upheld, there are no well-pled allegations that would support a reasonable inference that any such departure was significant enough to constitute bad faith.

In sum, it is not reasonably conceivable based on the Complaint's allegations that Dent could prove on a full record that the Individual Defendants acted in bad faith or otherwise breached their duty of loyalty by agreeing to the transaction with Cypress. Moreover, the Board's decision to sell the Company at a 71% premium to its unaffected stock price after a lengthy and public sales process was not "so far beyond the bounds of

---

[35] *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, *8 (Del. Ch. Oct. 16, 2013) (rejecting *Revlon* claim and dismissing complaint where merger agreement contained a no-solicitation provision, a poison pill, a 5.3% termination and expense reimbursement fee, information rights, and a top-up option); *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *13 (Del. Ch. Jan. 31, 2013) (dismissing complaint challenging merger agreement that included a no-shop provision, matching and information rights, a 3.1% termination fee, and a force-the-vote provision because they "have routinely been upheld as reasonable" by Delaware courts); *In re Synthes, Inc. S'holder Litig.*, 50 A.3d 1022, 1048 (Del. Ch. 2012) (dismissing complaint challenging a no-solicitation provision, a 3.05% termination fee, matching rights, a force-the-vote provision, and a voting agreement that locked up at least 33% of the company's shares in favor of the merger); *In re Orchid Cellmark Inc. S'holder Litig.,* 2011 WL 1938253, at *7 (Del. Ch. May 12, 2011) (noting that comparable deal protections "are unremarkable," that "the no-shop provision . . . is balanced by a fiduciary out," and that the "matching and informational rights" as well as a termination fee, "would not preclude a serious bidder from stepping forward.").

reasonable judgment that it seems essentially inexplicable on any grounds other than bad faith."[36] At most, the Complaint states a claim that the Individual Defendants breached their duty of care in agreeing to a transaction with Cypress at $3.10 per share and agreeing to the deal protection devices contained in their merger agreement. Because the Company has an exculpatory charter provision, however, that is not sufficient to state a viable claim for monetary damages. Thus, Dent's claim in this respect must be dismissed.

I turn next to Dent's claim that the Individual Defendants are liable for breaching their duty of candor.

### 2. Duty of candor claim

#### a. Legal standard

The duty of disclosure is a specific application of corporate directors' fiduciary duties of care and loyalty,[37] requiring directors "to disclose fully and fairly all material information within the board's control when it seeks shareholder action."[38] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[39] Stated another way, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[40] In that regard, Delaware law does not require information to be disclosed simply because that information "might be helpful."[41] Furthermore, courts must "guard

---

[36] *In re Alloy, Inc.*, 2011 WL 4863716, at *10 (Del. Ch. Oct. 13, 2011).

against the fallacy that increasingly detailed disclosure is always material and beneficial disclosure."[42]

To plead adequately a disclosure claim, a plaintiff "must allege that facts are missing from the Proxy, identify those facts, [and] state why they meet the materiality standard and how the omission caused injury."[43] The plaintiff bears the burden of demonstrating materiality.[44]

### b. It is not reasonably conceivable that Dent has a viable claim for breach of the duty of candor against the Individual Defendants

Dent's disclosure claims can be categorized into four groups based on the subject matters addressed by the challenged disclosures. Those groups are: the Company's management projections; the summary of Needham's analyses in the Proxy; the Proxy's description of the events leading up to the Cypress-Ramtron transaction; and conflicts

---

[37] *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del. 2001).

[38] *Stroud v. Grace*, 606 A.2d 75, 84 (Del. 1992).

[39] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) and adopting *TSC*'s materiality standard as Delaware law).

[40] *Id.*

[41] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

[42] *Zirn v. VLI Corp.*, 1995 WL 362616, at *4 (Del. Ch. June 12, 1995).

[43] *Wayne Cty. Employees' Ret. Sys. v. Corti*, 954 A.2d 319, 330 (Del. Ch. 2008) (quoting *Skeen*, 750 A.2d at 1174).

[44] *In re Siliconix Inc. S'holders Litig.*, 2001 WL 716787, at *9 (Del. Ch. June 19, 2001).

faced by Defendant George. I address these categories in turn, and conclude that none of them state a viable disclosure claim.

### c. Ramtron's management projections

Dent's primary disclosure-related argument pertains to Ramtron management projections for the years 2012 to 2016. Although Needham was given these projections and relied on them in conducting its DCF analysis, the projections were not disclosed to Ramtron's stockholders in the Proxy. Dent avers that these projections are material to the Company's stockholders and the Individual Defendants breached their duty of candor in failing to disclose them. I disagree.

There is no *per se* duty under Delaware law to disclose to stockholders financial projections given to and relied on by a financial advisor.[45] This is because the question of materiality under Delaware law is a context-specific inquiry, and "[t]he myriad of detailed information that must be furnished to shareholders necessarily differs from merger to merger."[46] In a bench ruling denying Dent's motion for a preliminary injunction to enjoin the Cypress-Ramtron merger, I held that these same management projections were not material.[47] I adhere to that prior holding.[48]

---

[45] *Cty. of York Emps. Ret. Plan v. Merrill Lynch & Co.,* 2008 WL 4824053, at *12 n.72 (Del. Ch. Oct. 28, 2008); *McMillan v. Intercargo Corp.*, 1999 WL 288128, at *6 (Del. Ch. May 3, 1999).

[46] *Glassman v. Wometco Cable TV, Inc.*, 1989 WL 1160, at *5 (Del. Ch. Jan. 6, 1989).

[47] Prelim. Inj. Hr'g Tr. 69–72.

It is undisputed that, because of Cypress's 78% interest in Ramtron at the time of the vote on the transaction, there was no doubt that Cypress would complete its acquisition of Ramtron. Thus, Ramtron's remaining stockholders were not being asked to weigh the transaction consideration versus the Company's future prospects. Rather, those stockholders were going to be cashed out regardless of how they voted, and the only question they faced was whether they wished to accept the merger consideration or seek appraisal pursuant to 8 *Del. C.* § 262.[49] To assist them in making that decision, the Proxy summarized four financial analyses conducted by Needham, including a DCF. While the Company's stockholders were not given the management projections, the Proxy disclosed that the merger consideration was: (1) in the valuation range implied by three of the four financial analyses; and (2) well below the DCF's valuation range of

---

[48] Because the record in this case has not changed since the preliminary injunction hearing, I arguably need not reexamine Dent's claim. *See McMillan v. Intercargo Corp.*, 768 A.2d 492, 507 n.67 (Del. Ch. 2000) (noting that where the record has not changed since a disclosure claim was found to be without merit on a motion for a preliminary injunction, the Court need not reconsider its prior analysis). Nevertheless, in the circumstances of this case, I believe it would be helpful to explain briefly my rationale for rejecting Dent's claim as to Ramtron's management projections.

[49] In that regard, this case is different from both *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171 (Del. Ch. 2007) and *Maric Capital Master Fund, Ltd. v. PLATO Learning, Inc.*, 11 A.3d 1175 (Del. Ch. 2010). In each of those cases, the stockholders were being asked to decide whether to tender their shares in return for a fixed sum of cash or remain stockholders in an ongoing business. Moreover, I carefully considered both of those cases in deciding Dent's motion for a preliminary injunction, and found them not to be controlling in this dispute. Prelim. Inj. Hr'g Tr. 71.

$3.57 to $5.01 per share. The remaining stockholders also were told explicitly that the DCF analysis was based on Ramtron's management projections.

In this context, other than making the conclusory allegation that the projections are "crucial" to stockholders, Dent has failed to explain how disclosing the Company's management projections used in the DCF would significantly alter the total mix of information available to the Company's stockholders. Because the stockholders were informed that the transaction consideration was lower than the DCF range, by how much it was lower, and that the DCF range was based on management projections, a reasonable stockholder could infer that the transaction consideration was lower than the Company's estimate of its own future earning potential.[50] In this case, therefore, disclosing the projections themselves would not provide stockholders with any meaningful additional information or insight as to whether they should tender their shares or seek appraisal.

I note also that during the course of expedited discovery related to the preliminary injunction hearing, Dent was given a copy of the projections that are the subject of this dispute. Importantly, notwithstanding his possession of the projections, Dent has made no allegation that the undisclosed projections are in any way inconsistent with, or otherwise significantly different from, the information that was disclosed. The Delaware

---

[50]  It also was disclosed in the Proxy that Ramtron made two counterproposals to Cypress, one at $3.50 per share and one at $3.25 per share. This information could help stockholders assess how reliable the Company believed its projections were.

Supreme Court has held that such a failure can be fatal to a claim for breach of the duty of candor.[51]

At most, the Complaint supports a reasonable inference that Ramtron's management projections may have been helpful to the Company's stockholders in electing whether to accept the transaction consideration or to seek appraisal. For omitted information to form the basis of a viable disclosure claim under Delaware law, however, that information must be material, not merely helpful. Ramtron's stockholders were given summaries of multiple financial analyses performed by the Company's financial advisor to help them make their decision, and were informed explicitly that one of those analyses indicated that the transaction consideration was below what the Company's internal projections would imply its value to be. Here, the details of those projections would not significantly alter the total mix of information available to the Company's stockholders. Therefore, the fact that the projections were omitted from the Proxy does not constitute a viable disclosure claim under Delaware law.

### d. Summary of Needham's financial analyses

Recognizing the questionable strength of his remaining disclosure claims, Dent spent less than two pages in his brief discussing the proverbial laundry list of issues he raised in the Complaint, and devoted much of that limited discussion simply to quoting the claims made in the Complaint itself. Unsurprisingly, none of these alleged disclosure violations can serve as the basis for a viable claim against the Individual Defendants.

---

[51] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

First, Dent challenges the completeness of the "Selected Company Analysis" included as part of Needham's fairness opinion. The Proxy discloses the names of the eight publicly traded companies used in that analysis, the high, low, mean, and median multiples of those eight companies, as a group, for certain valuation metrics, and Ramtron's projected multiple for each of those valuation metrics based on the proposed transaction with Cypress. Dent argues that a material omission exists as to the summary of this analysis because it does not provide the multiples for each of the eight individual companies, and without that information, stockholders cannot determine whether the eight companies actually are comparable to Ramtron.

This assertion is both inaccurate and irrelevant. It is inaccurate because the Proxy identified the eight publicly traded companies used in the analysis and any Ramtron stockholder that wished to determine independently the "comparability" of those companies simply had to access their public filings with the SEC. It is irrelevant because stockholders are entitled only to a fair summary of a financial advisor's work, not the data to make an independent determination of fair value. Dent has not articulated sufficiently in what way the reasonably comprehensive disclosures relating to the Selected Company Analysis fall short of providing a fair summary of the analysis Needham conducted in that regard. Moreover, Dent has not offered any cogent explanation as to how the additional granularity he seeks is anything more than helpful or cumulative to the information already disclosed, or how the individual company multiples would alter significantly the total mix of information available to Ramtron's

stockholders. Therefore, Dent's allegations of a disclosure violation as to the Selected Company Analysis fail as a matter of law.

Second, Dent challenged the adequacy of the Proxy's description of Needham's "Selected Transaction Analysis." He argues, as he did regarding the Selected Company Analysis, that the relevant valuation multiples are presented as a range and not on an individual company or transaction basis. Dent's attempt to retread his unpersuasive argument in this context is unavailing for the same reasons discussed above. The Proxy disclosed the acquirer and publicly traded target for each of the 13 deals Needham used in its analysis, as well as the range of two relevant valuation multiples over those same transactions. Dent has not cited any Delaware case law that supports his contention that the valuation multiples of each individual transaction needed to be disclosed here. Accordingly, I conclude it is not reasonably conceivable that Dent could prove on a full evidentiary record that the Selected Transaction Analysis contains a material omission because it does not include the valuation multiples for each of the individual deals on which the analysis is based.

Third, Dent disputes the completeness of the summary of Needham's "Stock Price Premium Analysis." According to Plaintiff this analysis contains material omissions because it "fails to disclose which transactions were analyzed, what information was relied upon and how Needham chose the sources of information upon which it chose to rely."[52] As to the allegation that the Proxy does not disclose what information Needham

---

[52] Compl. ¶ 75(c).

relied on, I find that allegation to be false. The Proxy states that "[Needham] analyzed the premium of consideration offered to the acquired company's stock price one trading day and five trading days prior to the announcement of the transaction."[53] Regarding Dent's assertion that the Proxy should have disclosed how Needham selected the sources of information it relied on, he cites no authority nor provides any rationale in support of his argument that such information would be material to Ramtron's stockholders in considering whether to accept the transaction consideration or seek appraisal. This is simply a "tell me more" request that, unlike a viable disclosure claim, fails to identify how the analysis is misleading or incomplete if it does not disclose specifically which publicly available source of information Needham used to do its work.[54]

Additionally, the allegation that the identity of the companies in the 22 transactions that were used in the analysis is material ignores the disclosures actually made in the Proxy. Ramtron's stockholders were informed that Needham "analyzed publicly available financial information for 22 merger and acquisition transactions that represent transactions involving publicly-traded technology and technology-enabled services companies completed since January 1, 2010 with transaction equity values of

---

[53]    Proxy 38. In that regard, I note that all of the transactions in the analysis involved publicly traded companies for which certain financial information is readily available.

[54]    *See In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1073 (Del. Ch. 2001) ("Delaware courts have held repeatedly that a board need not disclose specific details of the analysis underlying a financial advisor's opinion.").

between $50 million and $200 million."[55]  Thus, the universe of companies that were included in the analysis was sufficiently defined that those companies were readily identifiable through publicly available information.  While conceivably it might have been helpful to Ramtron's stockholders to identify the companies involved on an individual basis, such supplemental disclosures would not have significantly altered the total mix of information available to them.  Accordingly, Dent's allegations with respect to the Stock Price Premium Analysis fail to state a viable disclosure claim.

Fourth, Dent avers that the summary of Needham's DCF analysis failed impermissibly to disclose the manner in which stock-based compensation was treated and how any Net Operating Losses ("NOLs") were treated.  The Complaint does not allege that Ramtron actually had any NOLs, nor does Dent allege that Needham used either of these potential inputs in an inconsistent, atypical, or unexpected manner, such as, for example, by treating stock-based compensation as a cash expense.[56]  Here, stockholders were informed that the transaction consideration fell well below the valuation range of Ramtron implied by Needham's DCF analysis.  Plaintiff has not explained how knowing the details of how Needham treated those two inputs would be material to Ramtron's stockholders.

In fact, Dent made no effort, in his Complaint, in briefing, or at argument, to explain how the non-disclosed information would significantly alter the total mix of

---

[55]  *Id.*

[56]  *See Laborers Local 235 Benefit Funds v. Starent Networks, Corp.*, 2009 WL 4725866, at *1 (Del. Ch. Nov. 18, 2009).

information available to stockholders other than making the conclusory assertion that, without that information, Ramtron's stockholders "are unable to determine whether the DCF is reliable."[57]  This, however, appears to be a transparent attempt to repackage the argument that disclosures must contain enough information to enable a stockholder to make an independent determination of fair value.  But, this argument has been rejected explicitly by our Supreme Court.[58]  Having failed to adduce any cogent explanation that the increased granularity he seeks is material, and not simply helpful, to Ramtron's stockholders, Dent's allegations fail to state a legally cognizable claim for the breach of the duty of candor.

Finally, Dent argues that the summary of Needham's DCF is materially incomplete because the Proxy does not explain how Needham determined to use discount rates ranging from 20% to 23% or why it applied multiples ranging from 5x to 7x to calculate a range of illustrative terminal values.  This assertion ignores settled Delaware law and lacks merit for at least two reasons.  First, this Court has held repeatedly that asking "why" does not state a meritorious disclosure claim.[59]  Second, the exact details of

[57]  Compl. ¶ 75(d).

[58]  *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000) ("Appellants are advocating a new disclosure standard in cases where appraisal is an option. They suggest that stockholders should be given all the financial data they would need if they were making an independent determination of fair value. Appellants offer no authority for their position and we see no reason to depart from our traditional standards.").

[59]  *In re Sauer-Danfoss Inc. S'holders Litig.*, 65 A.3d 1116, 1131 (Del. Ch. 2011); *see also Loudon v. Archer–Daniels–Midland Co.,* 700 A.2d 135, 145 (Del. 1997)

31

how and why a financial advisor chooses certain discount rates or multiple ranges when conducting a DCF analysis goes well beyond the "fair summary" that is required under our law. In essence, Dent seeks additional disclosures that would support his belief that Needham erred in conducting its DCF analysis. The issue of whether Needham used the correct rates and multiples, however, is an entirely distinct issue from whether the Proxy contains a fair summary of the analysis that Needham actually conducted. Ramtron's stockholders undeniably were told what ranges Needham used in its analysis and, thus, were given sufficient information to understand what Needham did in its DCF analysis. Therefore, I dismiss Dent's disclosure claim predicated on a lack of information concerning how and why Needham used the discount rates and multiples that it did in its DCF analysis.

### e. Summary of events leading up to the transaction

Dent also has challenged the completeness of the disclosures in the Proxy regarding the events leading up to the Board's recommendation that the Company's stockholders approve the transaction with Cypress. The Proxy contains seventeen single-spaced pages of detailed descriptions of the key events leading up to the Cypress transaction. Plaintiff nevertheless alleges four deficiencies. Having reviewed carefully the Proxy, I conclude that Dent has failed to allege a viable disclosure claim as to the key events leading up to the Ramtron-Cypress transaction.

---

(affirming dismissal of a claim that did not identify disclosure violations but rather "pose[d] a question").

32

The first purported omission relates to a January 28, 2011 meeting between Cypress executives and certain Ramtron directors in which "the potential synergies between a business combination of Ramtron and Cypress was discussed."[60] According to Dent, the Proxy is deficient because it does not disclose what, if any, discussions Ramtron and Cypress had about potential business combinations before January 28, 2011, and the amount of the synergies that were discussed at the January 28 meeting. Dent offers no explanation as to why this requested information is material. There are no allegations that Ramtron and Cypress ever had any meaningful merger-related discussions before January 2011, and even if they had, it is not reasonably conceivable that preliminary conversations that occurred over eighteen months before the transaction was agreed to would significantly alter the total mix of information available to Ramtron's stockholders. This is particularly true in this case, because between January 2011 and September 2012, Ramtron rebuffed Cypress's takeover efforts on numerous occasions. That fact alone suggests that the January 2011 (or earlier) discussions, including any discussion of potential synergies, had little, if any, impact on what Cypress and Ramtron agreed to well over a year and a half later. Consequently, Dent has failed to state a viable disclosure claim in this regard.

Next, Dent argues that the Proxy is deficient because it fails to disclose the exact nature of the "several tactical considerations" the Board discussed with Needham during a June 13, 2012 meeting. The June 2012 meeting was one of several in which the Board

---

[60]     Proxy 15.

discussed its strategy for conducting the sales process, generally, and dealing with Cypress, specifically, with its financial advisor. Because the Board had a number of similar meetings, it is unclear why a more granular understanding of the particular "tactical considerations" discussed at one specific meeting would be material to Ramtron's stockholders. Moreover, "Delaware law does not require management 'to discuss the panoply of possible alternatives to the course of action it is proposing,'" in part because "stockholders have a veto power over fundamental corporate changes (such as a merger) but entrust management with evaluating the alternatives and deciding which fundamental changes to propose."[61] Therefore, the lack of specificity in the Proxy as to the "several tactical considerations" discussed during the June 13, 2013 meeting is insufficient to support a viable disclosure claim.

Third, Dent avers that the Proxy lacks sufficient details regarding the strategic alternatives the Company considered, how the Company evaluated those alternatives, and as to the 24 entities that were contacted, what types of entities made an offer and what the value of those offers were. As acknowledged in the Complaint itself, the Proxy states that the Board convened "many times" to discuss developments in the sales process and possible strategic alternatives to the Cypress deal. Here, too, Dent has not advanced any persuasive rationale for asserting that more details regarding these "many" meetings would be material to the Company's stockholders. The details provided in the Proxy

---

[61] *In re 3Com S'holders Litig.*, 2009 WL 5173804, at *5 (Del. Ch. Dec. 18, 2009) (quoting *Seibert v. Harper & Row, Publishers, Inc.,* 1984 WL 21874, at *5 (Del. Ch. Dec. 5, 1984).

sufficiently describe the sales process and potential strategic alternatives to allow the stockholders to draw their own conclusions about the transaction. Because I do not consider it reasonably conceivable that the "blow-by-blow" disclosures that Dent requests would significantly alter the total mix of information available to Ramtron's stockholders, the absence of those disclosures from the Proxy does not constitute an actionable disclosure violation.[62]

The same holds true for Dent's allegations regarding the 24 companies that Ramtron contacted during the sales process. Because Cypress had gained majority control of Ramtron through its tender offers, the close of the long-form merger was a *fait accompli*. Thus, when the Proxy was disseminated to Ramtron's stockholders, the only question they faced was whether to accept the merger consideration or seek appraisal. The types of companies that may or may not have made an offer for Ramtron during the sales process has no bearing on the issue of whether or not to seek appraisal. Furthermore, there are no allegations that any company made an offer for Ramtron that was of equal or greater value to the Cypress offer. Dent has failed to allege adequately how including the details of rejected offers that offered less value for the Company than the Cypress bid would be material to a Ramtron stockholder in determining whether or not to seek appraisal. Accordingly, I conclude that this aspect of Dent's disclosure claim also fails to state a claim upon which relief can be granted.

---

[62] *Matador Capital Mgmt. Corp. v. BRC Hldgs., Inc.*, 729 A.2d 280, 295 (Del. Ch. 1998) ("The application of [the reasonable investor] standard does not require a blow-by-blow description of events leading up to the proposed transaction.").

Finally, Dent complains that the Proxy fails to disclose the members of a subset of the Board that authorized Needham to deliver a counterproposal to Cypress and the process by which those Board members were authorized to take such actions.[63] It is dubious whether the information Dent seeks here even is relevant or helpful, let alone material. At best, the additional disclosures Dent requests on this subject amount to needlessly cumulative "play-by-play" information that this Court repeatedly has eschewed requiring companies to disclose.[64] Thus, these allegations also fail to state a legally sufficient claim for a disclosure violation.

Overall, Dent's challenges to the adequacy of the summary of key events leading up to the Cypress transaction are premised on a fallacy that this Court has long recognized and long rejected -- *i.e.*, that increasingly detailed disclosure is always material and beneficial disclosure.[65] The allegations in the Complaint and the content of

---

[63] The Complaint also alleges that the Proxy fails to disclose the amount of the counterproposal. Compl. ¶ 74. This allegation, however, is demonstrably false as the Proxy explicitly states that Ramtron made a counterproposal of $3.25 per share. Proxy 29.

[64] *Globis P'rs, L.P. v. Plumtree Software, Inc.*, 2007 WL 4292024, at *14 (Del. Ch. Nov. 30, 2007) ("a full and fair characterization [of background to a transaction] does not require . . . a 'play-by-play description of merger negotiations.'").

[65] *Abrons v. Maree*, 911 A.2d 805, 813 (Del. Ch. 2006) (stating that this Court must "guard against" such a fallacy); *Zirn v. VLI Corp.,* 1995 WL 362616, at *4 (Del. Ch. June 12, 1995), *aff'd,* 681 A.2d 1050 (Del. 1996) (same). *See also In re 3Com S'holders Litig.*, 2009 WL 5173804, at *5 (recognizing "that too much information can be as misleading as too little."); *Ryan v. Lyondell Chem. Co.*, 2008 WL 2923427, at *19 n.115 (Del. Ch. July 29, 2008), *rev'd on other grounds,* 970 A.2d 235 (Del. 2009) ("[A] lenient standard for materiality poses the risk that the corporation will bury the shareholders in an avalanche of trivial information, a

the Proxy do not support a reasonable inference that the unnecessary "play-by-play" disclosures Dent seeks would significantly alter the total mix of information available to the Company's stockholders. Therefore, Dent has not advanced a viable disclosure claim regarding the Proxy's summary of the key events leading up to the Ramtron-Cypress transaction.

### f. Defendant George's alleged conflict

In the Complaint, Dent alleges that the Proxy failed to disclose that Defendant George served on a "manufacturing advisory board" associated with Cypress, and, thus, that he had a material conflict as to the Ramtron-Cypress transaction. In support of this allegation, the Complaint cites to a June 2009 public filing of Power Integrations, Inc., an entity not otherwise involved in this dispute.[66] Nowhere in the Complaint is it alleged that George was a member of the manufacturing board at the time he was appointed to the 2012 Committee or when the Proxy was disseminated to Ramtron's stockholders. Instead, the Complaint misleadingly alleges that George was "retained as a member of Cypress' Manufacturing Advisory Board," "while acting in his role as a Ramtron Board member."[67] Moreover, Defendants argue that George resigned from the Cypress

---

result that is hardly conducive to informed decisionmaking.") (internal quotation marks and citation omitted).

[66] Compl. ¶ 67.

[67] *Id.* ¶ 66. Because George was on the Ramtron Board from 2005 until at least 2012, he was simultaneously a member of the Ramtron and Cypress manufacturing advisory boards in 2009. It does not follow, however, that he was a member of both boards in 2012, when he had a role on behalf of Ramtron in the events relevant to this litigation.

37

advisory board in April 2011, over a year before he was appointed to the 2012 Committee, and that Defendants provided Dent with documentary evidence to that effect.[68] Although Defendants discussed this issue in their opening brief, Dent did not address this issue in either his answering brief or at argument. As such, I find that Dent effectively has conceded that George was no longer a member of the Cypress advisory board after April 2011.

Because George was not a member of the Cypress advisory board after April 2011, Dent has failed to allege adequately that George's prior relationship with Cypress is material to Ramtron's stockholders. There are no allegations in the Complaint that would support a reasonable inference that George controlled, dominated, or otherwise exercised disproportionate influence over Ramtron's sales process. George was one of five members of the 2012 Committee. Because there are no allegations that he controlled or directed the 2012 Committee, it is unclear why George's past association with Cypress even would be relevant to stockholders weighing the choice between accepting the transaction consideration and seeking appraisal. In any event, based on allegations in the Complaint, it is not reasonably conceivable that such a prior relationship would have significantly altered the total mix of information available to Ramtron's stockholders.[69]

---

[68] Defs.' Opening Br. 40–41.

[69] *See Weinberger v. Rio Grande Indus., Inc.*, 519 A.2d 116, 123 (Del. Ch. 1986) (holding that failure to disclose certain director's potentially conflicting board positions did not state a claim because "at the time of the [] merger agreement, there was no relationship . . . that might give rise to a potential conflict.") Also as in *Rio Grande,* Dent has not shown here "in what manner such a potential conflict

38

In sum, the non-conclusory allegations in the Complaint do not support an inference that it is reasonably conceivable that Dent could prove on a full evidentiary record that any of the purported inadequate disclosures in the Proxy as to Ramtron's management projections, the summary of Needham's analysis, the description of the process leading to the Ramtron-Cypress transaction, and Defendant George's conflict are actionable disclosure violations. Therefore, I dismiss Dent's breach of fiduciary duty claim premised on the disclosures in the Proxy.[70]

### C.     Aiding and Abetting

#### 1.     Legal standard

To state a claim for aiding and abetting, a plaintiff must allege: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach.[71] The key inquiry in the aiding and abetting claim here is whether Dent has pled adequately the second element, knowing participation. Although there is no requirement that knowing

---

would have been important to a [Ramtron] stockholder considering whether or not to tender his shares to [Cypress] . . . ." *Id.*

[70] Because Dent has not alleged adequately a disclosure violation, I also dismiss Count III of the Complaint for the remedy of quasi-appraisal, which is based on the allegation that Ramtron's stockholders were not provided with adequate information in the Proxy to make an informed decision as to whether or not they should seek appraisal. Similarly, I dismiss the portion of Dent's aiding and abetting claim in Count II of the Complaint related to the Individual Defendants' alleged breach of their duty of candor because Dent has not alleged sufficiently an underlying breach of fiduciary duty. *DiRienzo v. Lichtenstein*, 2013 WL 5503034, at *36 (Del. Ch. Sept. 30, 2013).

[71] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

participation be pled with particularity, a plaintiff must allege facts from which knowing participation may be inferred in order to survive a motion to dismiss.[72] Significantly, however, "[t]his Court has consistently held that evidence of arm's-length negotiation with fiduciaries negates a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries."[73]

**2.      It is not reasonably conceivable that Cypress[74] aided and abetted any failure by the Ramtron Board to maximize the Company's sale price**

At the outset, in terms of the sale process, I note the only reasonable inference that the Complaint supports is that Cypress and Ramtron negotiated their transaction at arm's-length. Dent has pled no non-conclusory facts that Cypress created or exploited conflicts of interest in the Ramtron Board, conspired in any way with the Ramtron Board, used knowledge of a breach of a fiduciary duty to gain an advantage in negotiations with Ramtron, or participated in a transaction where the terms were so egregious or contained side deals, the magnitude of which, were "so excessive as to be inherently wrongful."[75] Rather, the Complaint alleges that over a period of more than 19 months, Ramtron engaged Cypress, an independent third party, in contentious arm's-length bargaining, which resulted in Cypress increasing its offer for the Company numerous times.

---

[72]      *In re Telecommunications, Inc.*, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003).

[73]      *In re Frederick's of Hollywood, Inc.*, 1998 WL 398244, at *3 n.8 (Del. Ch. July 9, 1998). *See also In re Gen. Motors S'holder Litig.*, 2005 WL 1089021, at *26 (Del. Ch. May 4, 2005) (same).

[74]      For purposes of this Section, all references to Cypress are inclusive of Rain.

[75]      *In re Telecommunications, Inc.*, 2003 WL 21543427, at *2.

Moreover, the Complaint acknowledges that Ramtron genuinely explored interest from other potential acquirers, and contains no allegations that suggest that Cypress was somehow favored over any of these other potential acquirers. In short, Dent faces a heavy burden in arguing that Cypress knowingly participated in any breaches of fiduciary duty by the Individual Defendants because there can be no dispute that the Cypress-Ramtron deal was negotiated at arm's-length.

As discussed *supra*, to the extent the Complaint conceivably supports a reasonable inference that the Individual Defendants breached their fiduciary duties by not maximizing Ramtron's sale price, any such breach was of the duty of care only.[76] Even assuming the Complaint states a claim for breach of fiduciary duty in this regard, Dent's aiding and abetting claim still fails because he has not alleged adequately that Cypress knowingly participated in this alleged breach. From the allegations in the Complaint, it does not appear that Cypress did anything more than engage Ramtron in arm's-length bargaining, in which it had every right to pursue the best possible deal for itself. Before reaching an agreement with Ramtron, Cypress did nothing to interfere with the Company's pursuit of other strategic alternatives or the Company's ability to evaluate sufficiently the adequacy of the offer it was making. In addition, none of the Board's actions, either before or after the Company agreed to a transaction with Cypress, were so

---

[76] Although the Individual Defendants are covered by the Company's exculpatory provision, Cypress, as an independent third party, is not. Consequently, it is possible for Cypress to be liable for monetary damages for aiding and abetting a breach of the duty of care even if the directors responsible for the breach itself cannot be held liable for such conduct. *See generally In re Rural Metro Corp.*, 88 A.3d 54 (Del. Ch. 2014).

41

unreasonable that it would support an inference that Cypress knew the Board was breaching its fiduciary duties and that it wished to facilitate any such breaches. Because Dent has not alleged sufficiently knowing participation, a requisite element of his aiding and abetting claim, his claim in this regard does not pass muster under Rule 12(b)(6).

Finally, Dent argues that Cypress knowingly participated in the Individual Defendants' breach of their duty of care because Cypress knew that the consideration being offered to Ramtron's stockholders was below the $3.57 to $5.01 per share valuation range for the Company determined by Needham in its DCF. This assertion, however, is without merit.

As an initial matter, I note that Dent has not alleged that Cypress had any knowledge of Ramtron's projections or the results of Needham's analysis before signing a merger agreement with Ramtron or that Needham's DCF analysis was the only method used to value Ramtron. In fact, the allegations in the Complaint that Cypress expressly declined to execute a confidentiality agreement with Ramtron and review its projections and that Needham presented several different financial analyses to Ramtron's Board support the opposite conclusion. Of greater significance, however, is the fact that the Cypress-Ramtron transaction indisputably was an arm's-length transaction between unrelated parties. In arguing that Cypress aided and abetted the Individual Defendants' breach of their fiduciary duties by obtaining a price below a financial advisor's valuation range, Dent essentially is arguing that Cypress got too good a deal, and that such conduct amounts to tortious conduct. Delaware courts expressly and repeatedly have rejected this

argument,[77] and Dent has not stated any cogent reason to depart from settled Delaware law on this point.

**3.     It is not reasonably conceivable that Cypress aided and abetted any breach of fiduciary duty by the Ramtron Board related to the deal protection measures**

Even assuming, as Dent asserts, that the Ramtron Board breached its fiduciary duties by agreeing to the deal protection measures that were used in the transaction with Cypress, the Complaint falls well short of alleging adequately that Cypress knowingly participated in any such breaches. Considered separately or together, Dent has failed to identify any aspect of any of the deal protection devices that was so untoward or egregious that it would support an inference that an independent third party, such as Cypress, knowingly participated in the Individual Defendants' breach of fiduciary duty. The Complaint supports a reasonable inference that Cypress and Ramtron negotiated their transaction at arm's-length, with each attempting to obtain the greatest possible benefit for themselves. The fact that Cypress may have obtained favorable deal protection measures through bargaining in this instance does not support a reasonable

---

[77]     *See Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) ("a bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting"); *Morgan v. Cash*, 2010 WL 2803746, at *8 (Del. Ch. July 16, 2010) ("Under our law, both the bidder's board and the target's board have a duty to seek the best deal terms for their own corporations when they enter a merger agreement. To allow a plaintiff to state an aiding and abetting claim against a bidder simply by making a cursory allegation that the bidder got too good a deal is fundamentally inconsistent with the market principles with which our corporate law is designed to operate in tandem."); *In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 735 (Del. Ch. 1999) ("it should be obvious that 'an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations.'").

43

inference that Cypress knowingly participated in any breach of fiduciary duty by Ramtron's Board. Therefore, I conclude that Dent's aiding and abetting claim against Cypress in this respect must be dismissed.

## III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted in their entirety. The Complaint is dismissed with prejudice.

**IT IS SO ORDERED**.